**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DARRELL MCKELVIE,                    :
                    Petitioner       :
                                     :
            v.                       :      No.
                                     :
                                     :
MORRIS HOUSER, et. al.               :
                    Respondents      :

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

CLAUDIA B. FLORES
Assistant Federal Defender
Federal Community Defender Office
  for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, PA 19106
215-928-1100

*Counsel for Petitioner, Darrell McKelvie*

July 10, 2023

Petitioner, Darrell McKelvie, through undersigned counsel, petitions for habeas corpus relief pursuant to 28 U.S.C. § 2254.

This Petition is being submitted in connection with a motion filed in the United States Court of Appeals for the Third Circuit seeking authorization to file a successor habeas corpus petition, pursuant to 28 U.S.C. § 2244. Accordingly, this Petition assumes that such permission has been granted.

## INTRODUCTION

This Petition presents a case of actual innocence. Darrell McKelvie is an innocent man who was convicted of killing Robert Henry Davis in 1975 and is currently serving a life sentence. Mr. McKelvie has maintained his innocence since his arrest in July 1974. This habeas petition is based on newly discovered evidence that proves he was prevented from presenting a defense at trial because the trial prosecutor withheld material exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the due process principles for which it stands. The newly disclosed evidence, in combination with the five witness recantations that emerged over the last several decades, demonstrate that he is actually innocent of the murder and related charges.

Mr. McKelvie has been incarcerated for 49 years as a result of his arrest, prosecution, and conviction for the 1974 fatal shooting of 15-year-old Robert Henry Davis, and the non-fatal shootings of Sheila Booker and Winston Burney in North Philadelphia. Mr. McKelvie has maintained his innocence since he was arrested when he was just 18 years old. The evidence against Mr. McKelvie at trial came from four teenagers—including two boys who were only 12 and 13 years old—who were present for the shooting on North Van Pelt Street. Three of those four teenagers have since recanted their identifications and affirmed that they were coerced by the police into identifying Mr. McKelvie and his co-defendant, Leslie Earp, as the shooters. Two of

the other teenagers, who did not identify Mr. McKelvie at trial, have also provided affidavits confirming that they too were coerced by law enforcement and that they did not believe Mr. McKelvie was the shooter.

In July 2022, the Commonwealth provided the contents of the Philadelphia Police Department homicide file to undersigned counsel. The homicide file contains several documents that were not turned over to trial counsel in violation of *Brady v. Maryland*. Because Mr. McKelvie is currently in the process of exhausting the *Brady* claim presented herein in state court, he intends to request that his case be stayed and held in abeyance.

## ELIGIBILITY AND BASES FOR RELIEF

1.        Petitioner sets forth claims in this Petition based on his actual innocence, his Sixth Amendment right to the effective assistance of counsel, and on violations of his right to due process of law under the Fourteenth Amendment to the United States Constitution. As such, Mr. McKelvie is eligible for relief under the federal habeas corpus statute.

## RELEVANT PROCEDURAL HISTORY

2.        Mr. McKelvie was arrested and charged with the shooting of three teenagers and the murder of one, Robert Henry Davis, under Philadelphia County, Pennsylvania docket number CP-51-CR-1009871-1974. Mr. McKelvie was tried before a jury and Judge Eugene Gelfand of the Pennsylvania Court of Common Pleas in January 1975. He was convicted of first-degree murder, two counts of aggravated assault, and conspiracy and was sentenced to life imprisonment. His murder conviction was affirmed on direct appeal. *Commonwealth v. McKelvie*, 370 A.2d 1155 (Pa. 1977).

3.        In 1978, Mr. McKelvie filed a petition for collateral relief under the Post Conviction Hearing Act (PCHA) arguing that his trial counsel was ineffective for failing to object to various

errors at trial. The state court held an evidentiary hearing, but ultimately dismissed the petition. *Commonwealth v. McKelvie*, Nos. 987-989, 992 (Phila. Ct. of Common Pleas 1979). That decision was affirmed by the Pennsylvania Superior Court in 1983. In 1985, Mr. McKelvie filed a pro se federal habeas petition, which was denied on the merits that same year.

4.  In 1994, Mr. McKelvie filed a second petition under the Post Conviction Relief Act (PCRA) alleging ineffective assistance of counsel and informing the court that some of the trial witnesses had recanted. In 1995, Mr. McKelvie obtained affidavits from two of the teenagers who testified at trial, Sheila Booker and Darwin Jones, but it appears that he was unable to present the affidavits to the PCRA court before his petition was dismissed without a hearing. He did present the Jones affidavit to the Superior Court on appeal, but the court refused to consider it as it never presented to the PCRA court, and the dismissal of the petition was affirmed. *Commonwealth v. McKelvie*, No. 00912 Phila. 1995 (Pa. Super. Ct. 1996) (Memo. Op.). In 2000, Mr. McKelvie filed a second federal habeas petition and submitted the 1995 affidavits from Sheila Booker and Darwin Jones. That petition was dismissed without prejudice as successive and unauthorized by this Court. *McKelvie v. Leftridge-Byrd*, No. 00-cv-3409 (E.D. Pa. Jan. 31, 2001). Mr. McKelvie attempted to appeal the dismissal to this Court, but this Court found that his appeal was untimely and that he was required to submit an application pursuant to 28 U.S.C. § 2244(b)(3)(A).

5.  In 2004, Mr. McKelvie filed a third PCRA petition, through counsel, and submitted affidavits from two additional witnesses who recanted their trial testimony, Winston Burney and Kevin Creamer. In 2006, the PCRA court dismissed the petition, finding it was untimely, and the Superior Court affirmed the dismissal. *Commonwealth v. McKelvie*, 927 A.2d 654 (Pa. Super. Ct. 2007) (table). In 2012, Mr. McKelvie filed a fourth PCRA petition, raising a claim seeking to expand *Miller v. Alabama*, 567 U.S. 460 (2012). In 2016, Mr. McKelvie filed a fifth PCRA petition

and again submitted affidavits from the four witnesses who had previously provided affidavits in 1995 and 2004: Sheila Booker, Darwin Jones, Winston Burney, and Kevin Creamer. That petition was also dismissed as untimely and the Superior Court affirmed its dismissal. *Commonwealth v. McKelvie*, No. 1773 EDA 2017, 2018 WL 3424358 (Pa. Super. Ct. 2018).

6.      Finally, in 2019, Mr. McKelvie filed a Motion for Relief from Judgment under Rule 60(b) seeking to reopen the 2001 judgment dismissing his habeas petition in light of *McQuiggin v. Perkins*, 569 U.S. 383 (2013), and argued that he was actually innocent. 2/1/19 Rule 60(b) Motion at 4. He attached the four affidavits submitted in 2016 in support of his motion. *Id.* at 11-18. Mr. McKelvie moved for the appointment of counsel, and on July 22, 2019, the District Court appointed the Federal Community Defender Office to represent Mr. McKelvie. 7/22/19 Order. In 2020, undersigned counsel notified the District Court that the matter could be dismissed, explaining that the Rule 60(b) motion was not the appropriate vehicle for challenging Mr. McKelvie's conviction in light of the fact that his original habeas petition was denied on the merits in 1985, and his 2000 habeas petition was an unauthorized second or successive petition. 1/2/20 Statement Regarding Status of Rule 60(b) Motion. Counsel informed the District Court that Mr. McKelvie would file an application seeking authorization to litigate a second or successive petition under 28 U.S.C. § 2244(b) as appropriate.

7.      On October 7, 2022, Mr. McKelvie filed a PCRA petition in the Philadelphia Court of Common Pleas, raising an actual innocence claim, a *Brady* claim, and an after-discovered evidence claim based on the newly disclosed documents from the homicide file and a newly obtained witness recantation from Ricky Beard. Mr. McKelvie is currently seeking authorization of this petition from the Third Circuit.

**STATEMENT OF THE FACTS RELEVANT TO PETITIONER'S CLAIMS**

**A. Evidence that Supported Mr. McKelvie's Initial Conviction**

8.     Mr. McKelvie's jury trial took place in January 1975. He was tried separately from his co-defendant, Leslie Earp, who was tried later that year. At trial, the Commonwealth presented as witnesses seven teenagers who had been present on North Van Pelt Street on July 28, 1974: Sheila Booker and her cousin, Kevin Creamer; Rodney and Nathaniel Hines; Winston Burney; Darwin Jones; and Ricky Beard. That day, 15-year-old Robert Henry Davis, known as "Angelo," was shot and killed; Sheila and Winston, also teenagers, were shot and sustained non-life-threatening injuries.

9.     Sheila testified that on the night of incident, at around 10:15 p.m., she had been sitting on the steps of 2311 North Van Pelt Street braiding Rodney's hair. N.T. 1/24/75 at 134. She saw a boy walking down the street from the direction of Dauphin Street and suddenly start shooting. N.T. 1/15/75 at 16; N.T. 1/23/75 at 134. She heard approximately six rapid shots and started running after the second shot. N.T. 1/15/75 at 10. She was soon shot in the leg and hid underneath a car when she could not keep running. N.T. 1/15/75 at 7, 11, 12-13; N.T. 1/24/75 at 134-35. Sheila was taken to the hospital for treatment and was never taken to the police station to identify anyone. N.T. 1/15/75 at 7, 15; N.T. 1/24/75 at 135. At Mr. McKelvie's suppression hearing, she stated that she did not see the shooter's face and could not see what he was wearing. N.T. 1/15/75 at 14, 16. When she was asked whether she could identify the shooter at trial, she said, "I don't know. It was too dark for me to see." N.T. 1/24/75 at 136.

10.     Nathaniel briefly testified that he had been standing around with the other teens when someone started shooting, but that he did not see who the shooter was. N.T. 1/24/75 at 223-24. Kevin Creamer, age 13; Ricky Beard, age 16; Darwin Jones, age 14; and Rodney Hines all identified Mr. McKelvie as the shooter at trial. On the night of the shooting, the boys were taken

5

for questioning to the Roundhouse, where Mr. McKelvie and Mr. Earp were brought in handcuffed before them. N.T. 1/24/75 at 202-03. One or more of the boys supposedly said, "They are the ones. . . . Those are the two that killed him," and then they all went on to provide statements identifying Mr. McKelvie as the shooter. N.T. 1/24/75 at 203; *see also* N.T. 1/16/75 at 9.

11.      All the boys initially told police that the shooter was "Little Man," despite the fact that Mr. McKelvie was consistently known by the nickname "Mutt." They knew Mr. Earp as "Crazy Earp." Kevin Creamer, who was only 12 years old at the time of the shooting, testified that both Mr. McKelvie and Mr. Earp shot at the teens. N.T. 1/24/75 at 89-90. He said that he heard four shots, looked up, saw Mr. McKelvie holding the gun, then saw him hand it to Mr. Earp, who fired two more shots. N.T. 1/24/75 at 90.[1] Kevin testified that at the time of the shooting, he thought Mr. McKelvie's nickname was Little Man, and said he knew him from seeing him at the school yard two or three times earlier that summer. N.T. 1/24/75 at 93-94. He testified that when the police responded to the shooting, he told them that Little Man and Crazy Earp had been the shooters. N.T. 1/24/75 at 95. He said they were members of the 25th and Diamond Street Gang, also known as the Valley Gang. N.T. 1/24/75 at 96-97.

12.      When questioned about Mr. McKelvie's nickname, Kevin said that he thought he had two nicknames – Little Man and Mutt – because he had once heard a boy call him by both names. N.T. 1/24/75 at 103-04. He claimed that although he had heard Mr. McKelvie referred to as Mutt several times and as Little Man only once, he "really thought his name was Little Man" and he provided that name to the police. N.T. 1/24/75 at 103-04.[2]

---

[1] At Mr. McKelvie's preliminary hearing, Kevin testified that Mr. McKelvie fired all six shots and that Mr. Earp grabbed the gun after he was done shooting. N.T. 10/2/74 at 19.

[2] At Mr. McKelvie's suppression hearing, Kevin testified that, although he told police Little Man was the shooter, he always knew Mr. McKelvie as Mutt from the school yard. N.T. 1/16/75 at 59. When asked who Little Man was, Kevin said "I am not sure, I think it is Mutt's brother." N.T.

13.    Kevin testified that the police took him and two of his other friends to the Roundhouse for questioning, where he saw Mr. McKelvie and Mr. Earp brought in while handcuffed. N.T. 1/24/75 at 109. He claimed that when he saw Mr. McKelvie, he remembered that his nickname was actually Mutt, not Little Man, and then told the police. N.T. 1/24/75 at 109. When trial counsel confronted Kevin with his police statement, however, the statement made no mention of Mutt, only Little Man. N.T. 1/24/75 at 108. Kevin admitted that he had referred to the shooter as Little Man in all his conversations with the police up until he saw Mr. McKelvie at the Roundhouse. N.T. 1/24/75 at 109. But he maintained that he told the police that Mr. McKelvie's nickname was Mutt and that he had made a mistake when he initially called him Little Man. N.T. 1/24/75 at 112. He denied hearing anyone else call him Mutt while in the waiting room at the Roundhouse or discussing Mr. McKelvie's nicknames with his friends after that night. N.T. 1/24/75 at 110-11. Kevin also testified that Mr. McKelvie had been wearing a flowered shirt at the time of the shooting but was wearing a white shirt when he was brought into the Roundhouse. N.T. 1/24/75 at 125.

14.    Ricky Beard testified that he had been sitting on the steps on Van Pelt Street when Mr. McKelvie and Mr. Earp approached the group and Mr. McKelvie started shooting. N.T. 1/24/75 at 141-42. Ricky said he had known both boys for about three years and that he knew Mr. McKelvie as Mutt and told the police Mutt was the shooter. N.T. 1/24/75 at 142, 144. He said he did not see Mr. Earp fire any shots. N.T. 1/24/75 at 152. Ricky testified that Mutt had been wearing a brown flowered shirt at the time of the shooting but was wearing a white t-shirt when he saw him at the police station. N.T. 1/24/75 at 148-49. He testified that he had heard of Little Man, who

---

1/16/75 at 62. He claimed that when he was asked who the shooter was at the Roundhouse, he "got the names mixed up and said Little Man – but I meant Mutt." N.T. 1/16/75 at 62.

was a member of the 25th and Diamond Street gang, but had never seen him. N.T. 1/24/75 at 147.

15.     Darwin Jones testified that he was first threatened by Mr. McKelvie and Mr. Earp before the shooting, when Mr. Earp pointed a handgun at his head and then walked away. N.T. 1/24/75 at 185-86. Soon after, the two boys came down Van Pelt Street and began shooting at the group. N.T. 1/24/75 at 189. Mr. McKelvie shot three times, then passed the gun to Mr. Earp, who fired another three shots. N.T. 1/24/75 at 191. Like Kevin Creamer, Darwin, who was only 13 years old at the time, initially told the police that Little Man and Crazy Earp were the shooters. N.T. 1/24/75 at 192. He testified that when he saw Mr. McKelvie and Mr. Earp brought into the Roundhouse in handcuffs, he said "They are the ones," loud enough for the others to hear. N.T. 1/24/75 at 203.

16.     At trial, Darwin claimed that he knew two different boys from the 25th and Diamond Street Gang[3] as Little Man, both of whom he had seen playing basketball at the rec center, but denied that he could have mixed them up. N.T. 1/24/75 at 207-09. He then testified that he only learned that Mr. McKelvie's nickname was Mutt when he talked to Ricky Beard the day after the shooting. N.T. 1/24/75 at 210. Darwin also testified that Mr. McKelvie had been wearing a flowered shirt during the shooting but was wearing a white shirt when he was brought into the Roundhouse N.T. 1/24/75 at 195, 217.

17.     Both Darwin and Ricky were asked about a man named Daniel Hall, whose nickname was Little Man and lived in the neighborhood, and who was brought into the courtroom by defense counsel wearing a flowered shirt. Both boys denied that Mr. Hall was the shooter and maintained that it was Mr. McKelvie who fired the shots. N.T. 1/24/75 at 171-72, 208-09.

---

[3] Darwin testified that he was friends with members of the rival Norris Street Gang, although he did not consider himself a member. N.T. 1/24/75 at 195-96.

18.     Rodney Hines, another teenager present on the scene, also testified at trial and identified Mr. McKelvie as the shooter.[4] Rodney testified that when the shots were fired, he turned and saw Mr. McKelvie shooting while wearing an orange flowered shirt. N.T. 1/16/75 at 5-7. When Rodney was first picked up by the police, he did not provide the names of the shooters, but he told detectives at the Roundhouse that the shooters were Little Man and Crazy Earp. N.T. 1/16/75 at 8-9, 26. When the police brought Mr. McKelvie and Mr. Earp into the room in handcuffs, Rodney said "That's them." N.T. 1/16/75 at 9. Mr. McKelvie was wearing a white shirt at the time. N.T. 1/16/75 at 38. Rodney testified that he knew Mr. McKelvie as Mutt, but that people used to call him Little Man, and that he had known him for three months from playing basketball at the school yard. N.T. 1/16/75 at 26-28, 38.

19.     Winston Burney, who was 15 years old, testified that he was shot in the buttocks while running away, but he did not identify Mr. McKelvie at trial. N.T. 1/24/75 at 138. He had initially identified Mr. McKelvie as the shooter at the suppression hearing, *see* N.T. 1/16/75 at 65 ("Darrell McKelvie came up and started shooting"), but it appeared that the trial court suppressed his identification.[5] At the suppression hearing, Winston testified that Mr. McKelvie was the person who shot him but said he had never seen either Mr. McKelvie or Mr. Earp before that night. N.T. 1/16/75 at 65, 78. He claimed that he was able to observe Mr. McKelvie during the brief period of time between the firing of the first and second shots, after which Winston started running. N.T. 1/16/75 at 78.

20.     Winston did not initially identify him at the hospital, where the police had brought

---

[4] Undersigned counsel does not have access to the transcript of Rodney's trial testimony, but instead refers to the testimony from the suppression hearing, which is presumably substantially similar.

[5] Undersigned counsel does not have access the portion of the transcript where the trial court announced its ruling on the motion to suppress, but Winston did not identify Mr. McKelvie as the shooter at trial as he had at the suppression hearing.

Mr. McKelvie and Mr. Earp, but did identify him later at the Roundhouse. N.T. 1/16/75 at 77-79. Winston testified that he did know a boy by the name of Little Man, who was a member of the 25th and Diamond Street Gang and played basketball at the school yard, but he said that person was not Mr. McKelvie. N.T. 1/16/75 at 79-80, 82.

21.     Officer Robert Lindenhofen testified that he responded to the scene shortly after the shooting and talked to Darwin Jones, Kevin Creamer, Rodney Hines, and Stanley Corbitt, another boy who did not testify at trial. N.T. 1/24/75 at 235-38. Darwin told him that Crazy Earp was the shooter, while Rodney and Kevin said the second person involved was Little Man. N.T. 1/24/75 at 237-38. Stanley Corbitt said he knew both of the boys and witnessed them doing the shooting. N.T. 1/24/75 at 235. No one mentioned Mutt or Mr. McKelvie by name.

22.     Officer Alton Smith testified that he arrested Mr. McKelvie and Mr. Earp near the scene of the shooting and that Mr. McKelvie was wearing a flowered shirt. N.T. 1/27/75 at 254. No weapons were recovered from the two boys. N.T. 1/27/75 at 261. Officer Paul Stanley claimed that he knew both Mr. Earp and Mr. McKelvie from his work in the gang unit and claimed that Mr. McKelvie was known both as Little Man and Mutt, as well as Ronne, which he corroborated with his entries in a gang record book he brought to trial. N.T. 1/27/75 at 270, 316. On cross-examination, he admitted that he identified Mr. McKelvie as Mutt, not Little Man, in the report documenting his arrest. N.T. 1/27/75 at 283.

23.     Officer Stanley responded to the scene where the boys were arrested and transported them to the hospital for identification by the shooting victims. N.T. 1/27/75 at 269. He testified that Mr. McKelvie was wearing a flowered shirt when he picked him up and when he was dropped off at the police precinct, where he was uncuffed. N.T. 1/27/75 at 270, 276. Officer Thomas Felke testified that he then transported Mr. McKelvie and Mr. Earp from the precinct to

the Roundhouse, and at the time he picked them up, they were both wearing white shirts. N.T. 1/27/75 at 293. Detective Lawrence Grace confirmed that Mr. McKelvie was wearing a white t-shirt at the Roundhouse. N.T. 1/27/75 at 305.

24.     Dr. Robert Catherman, the medical examiner, testified that three .22 caliber bullets were recovered from Angelo's body, but the police never found the weapon used in the shooting. N.T. 1/24/75 at 181.

25.     After the Commonwealth rested its case, the defense called 12 friends, relatives, and acquaintances of Mr. McKelvie's who all testified that he was known only as Mutt, never as Little Man or Ronne. *See* N.T. 1/27/75 at 325, 333, 337, 350, 354, 376. In closing, defense counsel argued that the teenage witnesses could not make a reliable identification and that they confused the person they saw shooting the gun with the person they saw at the Roundhouse. N.T. 1/27/75 at 393-96. The Commonwealth argued that Mr. McKelvie's nickname was unimportant and that the witnesses were sure of who they saw. N.T. 1/27/75 at 414. It maintained that Mr. McKelvie must have taken off the flowered shirt he was wearing while at the precinct before being transported to the Roundhouse. N.T. 1/27/75 at 420.

26.     At Mr. Earp's trial, the Commonwealth offered similar testimony from the teenage witnesses who were present for the shooting. Edward Jackson, a defense witness, testified that he was at Frank's Grocery walking toward Van Pelt Street when he heard some noise and witnessed a group of boys fighting and throwing objects at each other. N.T. 12/8/75 at 218-19. He then saw two boys run out onto the corner of Dauphin and North Van Pelt Streets and start shooting. N.T. 12/8/75 at 219. He testified that he knew neither of the boys was Mr. Earp because he had known Mr. Earp for several years. N.T. 12/8/75 at 219-20. Mr. Earp was convicted of first-degree murder but his conviction was reversed on appeal in 1978 as the result of a speedy trial violation.

11

*Commonwealth v. Earp*, 382 A.2d 1215 (Pa. 1978).

### B. Recantations McKelvie Presented in Post-conviction

27.     In 1995, Mr. McKelvie obtained affidavits from Sheila Booker and Darwin Jones. Sheila stated in her affidavit that when she was shot, she saw a very dark-skinned boy[6] holding a handgun, but that boy was not Mr. McKelvie. 2/15/95 Sheila Booker Affidavit (attached as Exhibit 1). She asserted that she informed the police and the prosecutor that Mr. McKelvie was not the shooter, but they "did not want to hear that" and urged her to "say that the boys they had arrested were the ones who did the shooting." *Id.*

28.     In his affidavit, Darwin Jones also stated that Mr. McKelvie was not the shooter. 6/20/95 Darwin Jones Affidavit (attached as Exhibit 2). He explained that he only identified Mr. McKelvie because he was told do so, and that he was compelled to testify against him after being put in juvenile custody. *Id.* He said he was coached to testify and told what to say and how to say it. Darwin also stated that he was told by the police and prosecutors that if he did not testify against Mr. McKelvie, "action would be taken against [him]." *Id.* He further asserted that the others who testified against Mr. McKelvie knew he was not the shooter. *Id.*

29.     In 2004, Mr. McKelvie's lawyer, Alston Meade, obtained affidavits from Winston Burney and Kevin Creamer, and submitted them with a counseled PCRA petition as newly discovered evidence. Winston Burney stated that he did not initially identify Mr. McKelvie on the night he was shot. 1/10/04 Winston Burney Affidavit (attached as Exhibit 3). He said that over the next several days, he was harassed by the police and others present at the scene of the shooting to falsely identify Mr. McKelvie as the shooter. *Id.* He recalled Darwin Jones suggesting to him that he give the police what they wanted, and he then agreed to testify against Mr. McKelvie so that

---

[6] Mr. McKelvie has a light to medium complexion.

the police would stop their harassment. *Id.* He said he was then coached by prosecutors to "perfect [his] false testimony." *Id.* Winston stated that at the time he provided the affidavit he was married with seven children and ran a roofing and home remodeling business. *Id.* He also confirmed that he had not had any contact with Mr. McKelvie during the time he had been incarcerated. *Id.*

30.     Kevin Creamer, who was also married with children and successfully employed at the time, similarly had had no contact with Mr. McKelvie. 4/14/04 Kevin Creamer Affidavit (attached as Exhibit 4). Kevin asserted that the shooter was a person he recognized as Little Man from the Valley Gang; Mr. McKelvie was a different person whom he knew by sight as Mutt. *Id.* When Kevin was brought to the Roundhouse on the night of the shooting, he was shown a photo of Mr. McKelvie, but he thought the person in the photo was Little Man. *Id.* When Mr. McKelvie was brought into the interview room, Kevin identified him as the shooter. *Id.* At trial, Kevin noticed that Little Man, the person who did the shooting, was sitting in the courtroom gallery. *Id.* He pointed this out to the prosecutor, and told them that Little Man was the shooter, but the prosecutor responded by removing Kevin from the courtroom. *Id.*

31.     In 2020, an investigator working with Mr. McKelvie's federal habeas counsel was able to speak with Winston Burney, Darwin Jones, and Kevin Creamer. Kevin Creamer said he stood by his 2004 affidavit in support of Mr. McKelvie. Winston Burney said that Darwin Jones was pressured by the police to convince Mr. Burney and the other teenagers present at the scene to name Mr. McKelvie and Mr. Earp as the shooters. Winston agreed to go along with the false identifications because he knew Mr. Earp as a bully who made his and his friends' lives difficult on the street. Winston was so bothered by his role that, when he turned 18, he went to the District Attorney's office to inform them about his and the others' false testimony, but nothing ever came of it.

32.     Darwin Jones confirmed that he had been pressured by the police to identify Mr. McKelvie and that he in turn pressured the other teens into identifying him as well. Darwin said he had initially hesitated to identify Mr. McKelvie and Mr. Earp because he did not see the shooter, but the police bent his arm around his back and pushed him against the wall while insisting that he had to identify the two boys as the shooters. After being questioned at the Roundhouse, Darwin ran into another boy who had been brought in with the group, Louis Cleveland, and learned that he had been brutally beaten in the head by the police while he was being questioned about the shooting. Darwin confirmed that he was coached on how to testify and told what to say: the police told him to identify Mr. McKelvie and Mr. Earp, provided the details about what he supposedly saw, including what the boys were wearing, and told him to say that Mr. McKelvie passed the gun to Mr. Earp so that he could continue shooting.

33.     Rodney Hines never provided an affidavit recanting his identification, and the investigator was unable to interview either him or his brother, Nathaniel, as they now both deceased. Sheila Booker is now deceased as well.

34.     In 2021, the investigator was able to interview and obtain an affidavit from Ricky Beard. Ricky said that he was present for the shooting, along with Winston Burney, but he never saw who the shooter was. 10/28/21 Ricky Beard Affidavit at 1 (attached as Exhibit 5). He was interviewed by detectives at the Roundhouse without his parents present and pressured by police into identifying Mr. McKelvie. *Id.* He was told that he would be sent to the Youth Study Center if he did not sign a statement. *Id.* Ricky remembered hearing what he thought was someone being beaten by police in another room. *Id.* At the time, Ricky could not read or write and did not understand what was contained in the statement he signed. *Id.* This new affidavit was presented as after-discovered evidence in a PCRA petition Mr. McKelvie filed in state court in October 2022.

All the surviving witnesses are available to testify at a hearing.

### C. Newly Discovered Evidence

35.     In July 2022, Mr. McKelvie's federal habeas counsel obtained a copy of Mr. McKelvie's homicide file from the Commonwealth. In it were several documents that were not turned over to trial counsel.

#### i.      *Notes from interviews with Sheila Booker and Winston Burney*

36.     All of the witnesses who testified against Mr. McKelvie at trial and allegedly identified him as the shooter were teenagers, some as young as 12 and 13 years old. They identified Mr. McKelvie as the shooter after the group of teens saw him at the homicide unit when the police brought him in, handcuffed, along with his co-defendant, Leslie Earp. Winston Burney identified Mr. McKelvie at the suppression hearing but testified that he had never seen him before the night he was shot. Winston has initially identified Mr. McKelvie as the shooter when he was brought into the Roundhouse in handcuffs along with Leslie Earp. However, Winston did not identify Mr. McKelvie as the shooter while he was being treated at the hospital and Mr. McKelvie was brought in for identification. From the police notes available in the police file, however, it appears that officers did obtain a description of the shooter from Winston: "dk. complexion, small bush; glasses." Hospital Police Notes (attached as Exhibit 6).

37.     Sheila Booker never made a formal police statement at the Roundhouse since she remained hospitalized after being shot in the leg, but she testified at trial during cross-examination that it was too dark for her to see the shooter and she therefore could not say whether Mr. McKelvie was involved. Like Winston, however, Sheila also provided officers at the hospital with a description of a shooter who wore glasses and had a "sm. bush."[7] Sheila Booker Police Notes

---

[7] In her 1995 affidavit, Sheila stated that she did look up briefly during the shooting and saw a "very dark-skinned" boy who was not Mr. McKelvie. 2/16/95 Sheila Booker Affidavit.

(attached as Exhibit 7).

      **ii.**    ***Statements regarding Barry Burton and Stephen Harris as alternative suspects***

38.      About two weeks after Mr. McKelvie was convicted on January 28, 1975, Leslie Earp was rearrested and brought in for questioning. Although Mr. Earp initially refused to make a statement when he and Mr. McKelvie were first arrested in July 1974, he provided the police with a full statement upon his rearrest. 2/10/75 Leslie Earp Police Statement (attached as Exhibit 8). In that statement, he described in detail what he and Mr. McKelvie had been doing on the night of the shooting and admitted that they had sought out weapons in an effort to attack a member of a rival gang. *Id.* at 1-2. However, Mr. Earp denied that he or Mr. McKelvie had anything to do with the shooting and instead named two other gang members, "Cool Dog" and "Slick," who possessed the only gun their group had access to, and who told Mr. Earp that they planned to use it that night. *Id.* Mr. Earp provided Cool Dog's real name, Barry Burton, and Burton was questioned by police on July 16, 1975. Id. at 4; 7/16/75 Barry Burton Police Statement (attached as Exhibit 9). In his statement, Burton denied that he was involved in the shooting or that he possessed a gun that night, but he admitted that about a month before the shooting, he possessed a .22 caliber pistol. *Id.* at 2-3. He also provided Slick's real name, Stephen Harris. *Id.* at 3.

39.      On July 2, 1975, officers also took a statement from Mr. Earp's mother, Evangeline Collins, in which she said that Mr. Earp was not involved in the shooting and that someone called "Lil Nard" had told Mr. Earp that Cool Dog and Slick were responsible. 7/2/75 Evangeline Collins Police Statement (attached as Exhibit 10). She also told police that her son Larry had also heard that Cool Dog and Slick were the perpetrators from a different person, Ray Doby. *Id.* at 4.

40.      In a page of police notes titled "INFO," it states that Lil Nard is Bernard McNeil, age 16, and that he told Mr. Earp that he was told by Slick that Slick and Cool Dog were

responsible. Bernard McNeil Police Notes (attached as Exhibit 11). The police notes are undated but they state that Bernard provided the information to Mr. Earp "last week." *Id.* According to Ms. Collins, Mr. Earp learned about Cool Dog's and Slick's involvement from Bernard in September 1974, before Mr. McKelvie's trial. 7/2/75 Evangeline Collins Police Statement at 4.

41.     With the exception of the police notes regarding Bernard McNeil, which are undated, the information about Cool Dog and Slick appears to have surfaced shortly after Mr. McKelvie's trial, once Mr. Earp made a formal statement. It does not appear that these notes or statements were turned over to Mr. McKelvie's counsel, as there was no mention of them in his direct appeal or postconviction petition

## CLAIMS FOR RELIEF

### I.     THE COMMONWEALTH SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*

42.     The Commonwealth violated Mr. McKelvie's constitutional right to due process, a fair trial, and the right to present a defense by withholding from him and his counsel material, exculpatory evidence, including impeachment evidence, in violation of his rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

43.     The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the notes from Winston Burney's and Sheila Booker's descriptions and the statements and related notes made by Leslie Earp, Evangeline Collins, and Barry Burton. There are three elements to the establishment of a *Brady* claim. The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668 691 (2004). First, the documents from the homicide file were exculpatory, as they provided evidence that the description of the perpetrator did not match Mr. McKelvie, and

they pointed to an alternative suspect.

44.     Second, the notes from Winston and Sheila were suppressed before and during trial. It is clear from the trial transcript that trial counsel did not have access to the notes containing the descriptions of the shooter when he briefly cross-examined Sheila Booker and Winston Burney. When questioning Sheila and Winston, he made no reference to prior statements or descriptions in his questions. When he questioned Kevin Creamer, Ricky Beard and Officer Robert Lindenhofen, however, trial counsel requested their prior statements at the time of his cross-examination. *See* N.T. 1/24/75 at 105, 145, 236. Counsel received and reviewed the statements for those three witnesses just before questioning them at trial, indicating that he had not received any discovery in the form of prior witness statements or descriptions before trial.

45.     With respect to the statements from Mr. Earp, Ms. Collins and Mr. Burton, even though they were obtained after Mr. McKelvie had been convicted, the Commonwealth was nonetheless obligated to disclose the statements while his case was still pending on direct review. These statements were obtained just weeks after Mr. McKelvie was convicted in January 1975, and within the time when trial counsel could have used them in support of a motion for a new trial.

46.     In any event, a conviction does not become final until it is affirmed by United States Supreme Court on the merits or by denial of certiorari or until the time for seeking such review expires. *Gonzalez v. Thaler*, 565 U.S. 134, 149 (2012); *Clay v. United States*, 537 U.S. 522, 527 (2003). Further, due process protections remain in place through a defendant's direct appeal process. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985) ("[I]f a State has created appellate courts as an integral part of the [ ] system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.") (internal quotation marks and citations omitted); *see also*

*Frank v. Mangu*m, 237 U.S. 309, 327 (1915) ("[I]t is perfectly obvious that where . . . an appeal is provided for, and the prisoner has had the benefit of it, the proceedings in the appellate tribunal are to be regarded as a part of the process of law under which he is held in custody by the state, and to be considered in determining any question of alleged deprivation of his life or liberty contrary to the 14th Amendment."). It thus follows that a prosecutor's obligation to comply with due process and the accordant duty to disclose imposed by Brady continues until a conviction is final. *See Goodwin v. Wetzel*, No. 18-cv-5269, 2022 WL 2759047, at *13 (E.D. Pa. June 15, 2022), report and recommendation adopted, No. 18-cv-5269, 2022 WL 2757702 (E.D. Pa. July 14, 2022) (finding there was "no question" that evidence of detective's misconduct had been suppressed and acknowledging that "a prosecutor's *Brady* . . . obligations remain in full effect on direct appeal . . . . because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness") (citing *Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012)).[8]

   47.   Finally, there is a reasonable probability that, had the Commonwealth disclosed the documents in the homicide file, trial counsel would have introduced them at trial and been able to obtain a different verdict. Had counsel had access to the notes documenting Sheila's and Winston's descriptions, he could have impeached them on the disparity between the description they provided

---

[8] Although the Supreme Court more recently held that *Brady* cannot be "applied as a post-conviction right" and that a prosecutor's obligation to disclose exculpatory evidence ends "after a defendant was convicted and the case is closed," *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68 (2009), the Court's earlier precedents make clear that a case is not "closed" and that a case is not in "post-conviction" until the conviction is final. *See Clay*, 537 U.S. at 527; *Fields*, 672 F.3d at 515 (citing *Osborne* and concluding that a prosecutor's "disclosure responsibilities do not end until the defendant either has been acquitted or has availed himself of all the direct process to which he is entitled"); *United States v. Munoz*, No. 05-cr-00668, 2009 WL 10700741, at *11 n.60 (C.D. Cal. Aug. 19, 2009) ("[E]ven following *Osborne*, the government's *Brady* obligations continue through the conclusion of direct appeal"). A *Brady* violation occurs when "a prosecutor, in the course of preparing for or conducting a trial *or direct appeal*, does not turn over the material evidence in question." *Fields*, 672 F.3d at 513-14 (emphasis added).

just after the shooting while they were at the hospital and the testimony they provided at trial.

48.     Mr. McKelvie's arrest photo, taken the day after the shooting, indicates that he did not wear glasses and that he had very short close-cropped hair, not a "small bush." *See* McKelvie Arrest Photo (attached as Exhibit 12). Mr. McKelvie affirms that he did not wear glasses at the time of his arrest. The description noted by the police upon Mr. McKelvie's arrest similarly indicated that he had close-cropped hair, a medium-brown complexion, and that he wore a black "jeff cap." *See* Police Investigation Report (attached as Exhibit 13). The description Sheila provided to the police would have contradicted her testimony that she did not see the shooter at all and would have allowed defense counsel to ask her whether Mr. McKelvie looked like the person she saw. Similarly, trial counsel could have used Winston's description to demonstrate that it did not match Mr. McKelvie and to elicit the fact that Winston did not identify Mr. McKelvie as the shooter when he was brought before Winston at the hospital.

49.     When considering whether evidence that has improperly been withheld from the defense is material requiring vacation of a conviction, a court must consider all of the evidence as a whole. The evidence must be considered not only on its own merit but in terms of what the evidence would have meant for the investigation of the case and preparation for trial. Even if withheld evidence might have been deemed inadmissible, it may still have had value in leading to other admissible evidence, supporting a discovery request or in finding additional witnesses. *Kyles*, 514 U.S. at 421 (materiality of *Brady* violation "turns on the cumulative effect of all such evidence suppressed by the government").

50.     In Mr. McKelvie's case, the Commonwealth failed to provide evidence that suggested two potential alternative suspects investigated by the police. Armed with this additional exculpatory evidence suggesting a different perpetrator, contradicting the Commonwealth's theory

of the case, and impeaching the Commonwealth's only witnesses implicating Mr. McKelvie, defense counsel would have had far more avenues to investigate and he would have been able to prepare very differently for trial. In other words, in assessing materiality, the Court considers how effective counsel could have proceeded in the absence of the due process violations both at trial and in pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); *id.*, 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *Bagley*, 473 U.S. at 676 (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by the defense, may have made a difference); *id.* at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled"); *Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009) ("The question under [due process] is whether disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); s*ee also Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009) (same); *Breakiron v. Horn*, 642 F.3d 126 (3d. Cir 2011) (same).

51.     Had this additional exculpatory and impeachment evidence been presented and argued at trial, there is a "reasonable probability of a different result": that the jury would have rejected the teenagers' identifications and acquitted Mr. McKelvie of murder. *Banks*, 540 U.S. at 691.

52.     The prosecution's failure to turn over the material, exculpatory, and impeachment evidence from the homicide file violated *Brady* and its progeny, and Mr. McKelvie's right to due

21

process and a fair trial. The new evidence of potential third-party guilt and critical impeachment material regarding the initial descriptions of the perpetrator that did not match McKelvie undermines the confidence in the verdict at his trial and created a reasonable probability of a different result. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *Banks*, 540 U.S. at 703.

## II. ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBTAIN AND PRESENT THE EVIDENCE RECENTLY DISCLOSED BY THE COMMONWEALTH

53. Should this Court determine that the evidence described above was not suppressed by the prosecution, then "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."); *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (applying the *Strickland* standard retroactively). If counsel had possessed that evidence, he could have questioned Sheila Booker and Winston Burney about their initial descriptions of the shooter, which did not match Mr. McKelvie, and investigated and presented exculpatory evidence demonstrating that Barry Burton and Stephen Harris had access to the weapon used in the murder and were potentially the actual perpetrators. The materials recently disclosed by the Commonwealth constitute powerful impeachment and exculpatory evidence that would have challenged the reliability of the witness identifications and the reliability of the police investigation into the shooting. Accordingly, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## III. MR. MCKELVIE IS ACTUALLY INNOCENT

54. Newly discovered evidence presented in the proposed habeas petition demonstrates that the police had received several reports that Barry Burton and Stephen Harris, not Mr.

22

McKelvie and Leslie Earp, were the perpetrators of the shooting. Further, the police notes documenting a description of a perpetrator with dark skin, a small bush, and glasses indicates that someone other than Mr. McKelvie was the shooter. Along with the five witness recantations Mr. McKelvie has already presented in state court, this evidence undermines and contradicts the scant evidence presented by the Commonwealth at trial, demonstrating that Mr. McKelvie is actually innocent.

55.    Innocence constitutes a substantive ground upon which to relieve Mr. McKelvie of his unconstitutional incarceration. *See, e.g., House v. Bell*, 547 U.S. 518 (2006) (remanding capital case for evidentiary development on whether petitioner was actually innocent; the petitioner subsequently was exonerated); *Kuhlman v. Wilson*, 477 U.S. 436, 452 (1986) ("a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated"); *In re Winship*, 397 U.S. 358, 364 (1970) ("It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."); *In re Davis*, 557 U.S. 952 (2009) (remanding petition for writ of habeas corpus to the district court to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence").In *Herrera v. Collins*, 506 U.S. 390 (1993), a plurality of the Supreme Court assumed that a freestanding substantive claim of actual innocence is cognizable under federal law. *Id.* at 417, 419, 430-37; *see also House*, 547 U.S. at 555 (reiterating *Herrera* principles).[9] Chief Justice Rehnquist, writing for the plurality in *Herrera*, stated that the showing required to obtain habeas relief on an actual innocence claim is a "truly persuasive demonstration

---

[9] While *Herrera* was a capital case, freestanding innocence claims in non-capital cases also have been held to be cognizable in federal habeas proceedings. *See Osborne v. District Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118, 1131 (9th Cir. 2008) (citing standard set forth in *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc)).

of 'actual innocence.'" *Herrera*, 506 U.S. at 417. Such a showing would require an "extraordinarily high" burden. *Id.*; *see also House*, 547 U.S. at 554.

56.    As demonstrated above, Mr. McKelvie meets this standard. There is no remaining credible evidence that Mr. McKelvie as the perpetrator of the shooting. In accord with the Fourteenth Amendment's guarantee of Due Process, Mr. McKelvie's conviction and sentence must be vacated. At the very least, Mr. McKelvie has made a sufficient showing of his innocence to obtain an evidentiary hearing on this issue.

57.    In *Herrera v. Collins*, 506 U.S. 390 (1993), a plurality of the Supreme Court assumed that a freestanding substantive claim of actual innocence is cognizable under federal law. *Id.* at 417, 419, 430-37; *see also House*, 547 U.S. at 555 (reiterating *Herrera* principles).[10] Chief Justice Rehnquist, writing for the plurality in *Herrera*, stated that the showing required to obtain habeas relief on an actual innocence claim is a "truly persuasive demonstration of 'actual innocence.'" *Herrera*, 506 U.S. at 417. Such a showing would require an "extraordinarily high" burden. *Id.*; *see also House*, 547 U.S. at 554.

58.    As demonstrated above, Mr. McKelvie meets this standard. There is no remaining credible evidence that Mr. McKelvie is the perpetrator of the shooting. In accord with the Fourteenth Amendment's guarantee of Due Process, Mr. McKelvie's conviction and sentence must be vacated. At the very least, Mr. McKelvie has made a sufficient showing of his innocence to obtain an evidentiary hearing on this issue.

---

[10] While *Herrera* was a capital case, freestanding innocence claims in non-capital cases also have been held to be cognizable in federal habeas proceedings. *See Osborne v. District Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118, 1131 (9th Cir. 2008) (citing standard set forth in *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc)).

## EXHAUSTION AND TIMELINESS

59.     **Exhaustion.** The claims contained herein have not yet been reviewed by the state courts. However, Mr. McKelvie filed a PCRA petition in the Court of Common Pleas, Philadelphia County, Pennsylvania in October 2022. That matter is docketed at *Commonwealth v. Darrell McKelvie*, CP-51-CR-1009871-1974 (Phila. Ct. Com. Pl. 2022), and is assigned to the Honorable Scott DiClaudio. The allegations contained in the PCRA petition largely mirror those contained herein.

60.     Undersigned counsel will make a separate request to stay and abey Mr. McKelvie's federal proceedings pursuant to *Rhines v. Weber*, 544 U.S. 269, 275-77 (2005), while his claims are reviewed in state court.

61.     If, at the conclusion of Mr. McKelvie's state litigation, it is determined that one or more of his claims is procedurally defaulted, that default should not bar relief because of his credible evidence of innocence. *See* Claim III, *supra*; *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations.").

62.     **Timeliness.** Under AEDPA's statute of limitations, Mr. McKelvie had one year from the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, 28 U.S.C. § 2244(d)(1)(B); or from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence, § 2244(d)(1)(D). Undersigned counsel obtained the relevant documents from the homicide file on July 11, 2022.

63.     Each of the claims raised in this Petition is timely because it was filed within a year

of the date when the factual predicate could have been discovered through the exercise of due diligence, and within a year of when the impediment to Mr. McKelvie ability to raise the claim – the Commonwealth's suppression of the documents in the homicide file – was removed.

64.     Even if the claims raised herein were untimely, the Court could still review their merits notwithstanding the AEDPA statute of limitations due to the compelling evidence of Mr. McKelvie's actual innocence. *See McQuiggin*, 569 U.S. at 386.

### PRAYER FOR RELIEF

For all of the reasons discussed above, Mr. McKelvie requests that the Court:

A.     Hold these proceedings in abeyance pending resolution of the state court proceedings;

B.     Upon reactivation of these proceedings, require the Commonwealth to respond to this Petition;

C.     Grant a full evidentiary hearing so that Mr. McKelvie can fully prove his claims; and

D.     Grant habeas corpus relief.

Respectfully submitted,

*/s/ Claudia B. Flores*
CLAUDIA B. FLORES
Assistant Federal Defender
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
(215) 928-1100

*Counsel for Petitioner Darrell McKelvie*

July 10, 2023

# EXHIBIT 1

## AFFIDAVIT OF SHEILA M. BOOKER

1. On JULY 28, 1974 at 10:30 pm I was present at the 2300 Block of Van Pelt Street sitting on the steps of 2313 with a few friends when I looked across from where I was sitting, I noticed this very very dark-skinned black teenager wearing a white T-shirt, and dark blue jeans.

2. Glancing down from where I was at no more than a few seconds shots were being fired and we all stated running immediately.

3. I saw for an instant as I stating running the dark-skinned boy stated shooting a handgun, but it was not Darrell McKelvie.

4. This is what I told the police, the detectives, and the district attorney who apparently did not want to hear that, they were only uring us to say that the boys they had arrested were the ones who did the shooting.

5. Seeing the person they claimed did the shooting at the trial, I told the police, the detective, and the district attorney that I did not see neither one of the two boys doing the night of the shooting, they simply were not there. I did not see Darrell McKelvie that night.

I sworn to the above statement on this day of October 20, 1995 that the statements are true.

Sheila M. Booker

_Sheila M. Booker_

sworn to and subscribed before me
this ___ day of _FEB_ 19___

NOTARIAL SEAL
WILLIAM E YOUNG JR, Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 17, 1998

33

# EXHIBIT 2

## AFFIDAIT OF DARWEN JONES

I, **Darwen Jones,** after being duly sworn according to law  deposes and says that the facts setforth herein are true and correct to the best of my knowledge, information and belief;

1)  That in 1975 when I was a juvenile, at the age of 14-years and and couple of months I was compelled to testify against **Darell McKelvie** while being constantly taken from juvenile custody to city hall, in the City of Philadelphia.

2)  That I was paid through checks from the District Attorney's and the Philadelphia Police to give testimony against **Darell McKelvie.**

3)  I, further know of my of personal knowledge that it definitely was not Darell McKelvie in the case that I testified in, that I said it was him because I was doing what I was told to do, and over all of these years it has pained me to know that I caused this man to suffer such a great injustice, that I never inmagined would cause such pain and anguish for this man.

4)  I, further know of my  own personal knowledge that the others who testified against **Darell McKelvie** know that it was not him that we should have b identifying; IT DEFINTIELY WAS NOT HIM.

5)  Further, I was threatened by the Philadelphia Police and Detectives, and other authorities from the District Attorney's Office that if I didn't testify against this man action would be taken against me.

6)  Further, I was constantly being groomed to testify, and what to say, and how to say it; and told don't say this like that, say this this way.

7)  I am willing to give this testimony to correct this matter before the Court in City Hall if necessary to correct the injustice I helped to bring upon this man.

_____
                                 Darwen Jones

SWORN TO THIS _____ DAY OF JUNE, 1995

BEFORE THE NOTARY PUBLIC

Notarial Seal
Elizabeth Jane Kovich, Notary Public

# EXHIBIT 3

*Appendix    C*

**ALSTON B. MEADE, JR., ESQUIRE**

1514 PINE STREET, 3-F

PHILADELPHIA, PA 19102

(215) 732-9987

### AFFIDAVIT OF WINSTON BIRNEY

I, Winston Birney, certify and affirm that the testimony that I gave in the case of *Commonwealth v. Darrell McKelvie*, October Sessions, 1974, Nos. 987-92, was false, and that I could not identify the person who shot and killed Robert Henry Davis on July 28, 1974.

During the night of, and at the time of the shooting, I was present on the northeast corner of Dauphin and Van Pelt Streets in Philadelphia, Pennsylvania. When the shooting started, I had my back turned away from the direction from which the shots came. I began to run north on Van Pelt Street, after the first shot, without looking to see who fired the shots.

When I was taken to the Philadelphia Police Administration Building on the night of the shooting, I never identified Darrell McKelvie as the shooter. For several days after the shooting, police harassed me and other people who were present on the corner on the night of the shooting. I was threatened with potential arrest and prosecution for crimes that I never committed. Eventually, Darwin Jones, one of the people in my company at the corner of Dauphin and Van Pelt Streets when the shooting occurred, suggested to myself and others that we give the police what they want, and testify falsely that Darrell McKelvie shot Robert Henry Davis. We agreed to promote our false testimony so that the police would stop their harassment. Once my cooperation was given, I was coached extensively by attorneys in the District Attorney's Office to perfect my false testimony.

I am 44 years old. I presently work for Cardinal Health Company. I own rental property, and I am a sole proprietor of Buckets Roofing and Home Remodeling. I am married with seven children. I also volunteer my time to run youth basketball leagues at the Hank Gathers Center. Although I knew Darrel McKelvie, I am not nor have I ever been his friend or enemy. Nor have I ever had any communications with McKelvie during the time he has spent in prison. I have no reason or motivation by way of threat or award to come forward and expose the fact of my false testimony other than to clear my conscience and to see that an injustice is corrected.

I am ready, willing and able to testify in court about the contents of my affidavit.

Sworn to and subscribed
before me this 10th day
of January, 2004.

_____
Winston Birney

_____
Notary Public

NOTARIAL SEAL
ATIQ UR CHAUDHRY, Notary Public
City of Philadelphia, Phila. County

# EXHIBIT 4

Appendix B

**ALSTON B. MEADE, JR., ESQUIRE**

1514 PINE STREET, 3-F

PHILADELPHIA, PA 19102

(215) 732-9987

## AFFIDAVIT OF KEVIN KREAMER

I, Kevin Kreamer, certify and affirm that the testimony that I gave in the case of *Commonwealth v. Darrell McKelvie* was false, and that I believe that McKelvie did not shoot and kill Robert Henry Davis on July 28, 1974.

During the night of, and at the time of the shooting, I was present on the northeast corner of Dauphin and Van Pelt Streets in Philadelphia, Pennsylvania. When the shooting began, I saw a person who I believed to be "Little Man." I knew Little Man to be a member of the Valley gang. I also knew a person, by sight only, with the nickname of Mutt who I latter was informed was McKelvie. Mutt was also a member of the Valley gang and resembled Little Man.

When I was taken to the Police Administration Building on the night of the shooting, I told police that Little Man was the person along with "Crazy Earp" who shot Davis. I was twelve years old at the time of the murder. The police officer who interviewed me, showed me a picture of McKelvie. I though the person in the picture was Little Man. I told the officer that McKelvie was present and that he was the shooter. The officer told me that the person in the picture was Mutt. McKelvie was brought into the interview room, and I identified him as the shooter.

I recall that during the trial, after I testified, I noticed that Little Man was sitting in the gallery. I got the attention of the Assistant District Attorney, I pointed to Little Man in the gallery, and told the Assistant District Attorney that Little Man was Henry's killer. At that point, after comparing him to McKelvie in the courtroom, I believed that Little Man was the person that I saw that night as the shooter. The Assistant District Attorney had me removed from the courtroom.

I presently work for the Renaissance Hotel as an HVAC engineer. I am married with three children. Although I knew Darrel McKelvie, I am not nor have I ever been his friend or enemy. Nor have I ever had any communications with McKelvie during the time he has spent in prison. I have no reason or motivation by way of threat or award to come forward and expose the fact of my false testimony other than to clear my conscience and to see that an injustice is corrected.

I am ready, willing and able to testify in court about the contents of my affidavit.

Sworn to and subscribed
before me this 14th day
of April, 2004.

( KEVIN THOMAS CREAMER SR )
Sworn to and subscribed before me
this 14 day of APRIL 2024

Kevin Kreamer

Notary Public

NOTARIAL SEAL

# EXHIBIT 5

**AFFIDAVIT OF RICKY BEARD**
**Pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904**

I, Ricky Beard, hereby declare, verify and swear as follows:

1. I was on the corner of Dauphin and Van Pelt Streets on July 28, 1974 when Robert Henry Davis was murdered. Robert was my friend. My other friends, Winston Burney, Nate Hines, and Sheila Booker were there as well. I can't remember if Darwin Jones and Kevin Creamer were also present at the time of the shooting.

2. This occurred a long time ago and I do not remember certain things. However, I definitely remember being taken to the police station the night of the shooting. I was sixteen years old and neither of my parents were brought to the police station. Without my parents present, the police pressured me and all my friends to say that Mutt, Darrell McKelvie, was the shooter. They said if I didn't sign a police statement they would not let me go home. They said they would take me to the Youth Study Center instead. One of the other teenagers present also pressured me into identifying McKelvie. Near where I was being interviewed at the police station, I could hear a person yelling and screaming and I thought maybe they were being beaten. When the police interviewed me I had recently been shot and I was using a cane. I was terrified when the police made me sign a statement.

3. The truth is that I do not know who did the shooting. I was facing away from the shooting talking with my friends when shots were fired. At the time of the incident, I had heard of Mutt, but did not know who he was. I did know Leslie Earp from the neighborhood.

4. I recall being asked to sign a statement around the time the police questioned me. In 1974, although I knew how to write my name, I was not able to read or write, so I never read the statement I signed. I dropped out of school in the ninth or tenth grade. I was in special education because I could not read. Today I am able to read a little but I cannot spell very well.

5. On October 7, 2021, lawyer Claudia Flores and investigator Brian O'Leary showed me and discussed with me my testimony at Mr. McKelvie's trial. Although I remember testifying at Leslie Earp's trial, I have no memory of testifying at Mr. McKelvie's trial. However, according to the transcript I was shown, I identified McKelvie as the shooter. That is false. As I stated above, I did not ever see the shooter.

6. This affidavit accurately describes what I remember as well as the conversation I had with attorney Claudia Flores and investigator Brian O'Leary. Before I signed it, this affidavit was read to me in the presence of my wife Suzette Beard, whose signature also appears below.

I hereby swear that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the provisions of 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

_Ricky Beard_
Ricky Beard

_Suzette Beard_
Suzette Beard

JANE E NEAL
Commission # 50096962
Notary Public, State of New Jersey
My Commission Expires
01/15/2024

_Jane E. Neal_ 10/28/2021
Notarized in Burlington County, New Jersey
on October 28, 2021.

RB

# EXHIBIT 6

② Shiela Booker 15 7/F

▮▮▮▮▮▮▮▮▮▮

shot left thigh
cond: good
Dr Rosensheim.

③ St. Jos.?
Winston Berney 17 N/m

▮▮▮▮▮▮▮▮▮

shot left buttocks
in out.
Dr. J. Lee.

outside 1 7/m — 16 — 17
DR comp. small bush.
glasses — said nothing.

D. MCKELVIE
FED 2022

H74-266DarrellMcKelvieHFile021

# EXHIBIT 7

H74-266DarrellMcKelvieHFile038

Sheila Booker 15

Jack. L. THIGHE about here

Sitting on steps 2311 N. Van Pelt
with Henry + Winston, Rodney?
Nate? Rickie, talking, see
this boy come around
corner and stand near pole
then I heard a shot and
everybody started running.
I fell.

the boy was wearing glasses
had a gun. bush 16-17

heard about 5-6 shots.

lady pulled me in her
house last I saw
Angelo he was laying on
ground.

# EXHIBIT 8

"CRAZY"

INTERVIEW SHEET

SAUNDERS # 9488

HOMICIDE DIVISION          CASE # H74-266   INTERVIEWED BY HARMON #5253

NAME Leslie Earp          AGE 17   RACE N. D.O.B. ▓▓▓▓▓

ADDRESS ▓▓▓▓▓▓▓▓▓           APT.#   PHONE ▓▓▓▓▓▓▓

SCHOOL
NAME OF EMPLOYMENT _____   SOC.SEC.# _____

SCHOOL
ADDRESS OF EMPLOYMENT _____   PHONE _____

BROUGHT IN BY Pol. Noe #2577 - Reid #7183  EPW #601   DATE & TIME 2-10-75 - 2:15/PM

PLACE OF INTERVIEW Room #104 PAB  SUB Room #118   DATE & TIME 2-10-75  2:55/PM

WE ARE QUESTIONING YOU CONCERNING: THE HOMICIDE BY SHOOTING OF ROBERT DAVIS 15, N/M RES. ▓▓▓▓▓▓ WHICH OCCURRED ON THE HWY 2311 N. VAN PELT ST ON SUN. 7-28-74 AT 10:15 PM.

WARNINGS GIVEN BY: HARMON #5253   DATE & TIME 2-10-75 2:57/PM

ANSWERS: (1) YES (2) YES (3) NO (4) YES (5) YES (6) NO (7) YES

Leslie Earp

Q ARE YOU WILLING to tell ME ALL YOU KNOW CONCERNING THIS HOMICIDE? AND DO YOU REALIZE YOU ARE BEING RE-ARRESTED IN THIS CASE? A. YES L.E

A- THAT SUNDAY ABOUT TWO O'CLOCK IN THE AFTERNOON ME AND MUTT WERE SITTING ON THE BENCHES IN THE CENTER OF THE PARK OF 2309 BUILDING. SO THEN COOL DOG, AND ABOUT TEN MORE OF US WAS THERE TOO. WE STAYED ON THE BENCHES DRINKING BEER UNTIL AROUND EIGHT O'CLOCK. I WENT HOME A COUPLE OF TIMES AND CAME BACK BEFORE EIGHT ME, AND MUTT ASKED COOL DOG AND SLICK FOR THE PISTOL, BECAUSE THESE MEN DIDN'T COME. WE WERE WAITING AROUND FOR SOME MEN WHO CAME DOWN AND STARTED SHOOTING AT ALL OF US. BECAUSE

RECORD: YES ✓   NO: _____   CHECKED BY: _____

REVIEWED BY: Leslie Earp

INTERVIEW SHEET _       PAGE: ( 2 )       CASE # _____

NAME  LESLIE EARP

THEY SAID SOME BOY NAMED NICK FROM OUR
CORNER ROBBED THEM. WE WERE WAITING
FOR THEM TO COME BACK. TO SEE IF
THEY TRIED TO GET ONE OF US AGAIN.
COOL DOG DIDN'T WANT TO GIVE THE GUN
TO US. SO WE WENT TO MUTT'S HOUSE
AND GOT TWO SCREW DRIVERS. AND SHARPENED
THEM ON THE GROUND. THEN ME AND HIM WENT
TO TWENTY SECOND AND DAUPHIN. MUTT
WANTED TO CATCH A STRAGGLER FROM NORRIS
STREET. WE TURNED DOWN TWENTY SECOND
STREET TOWARDS GLENWOD AVENUE. THEN
WE TURNED DOWN YORK STREET AT TWENTY
SECOND THEN WE TURNED BACK ON GLENWOOD
AVENUE AGAIN. THEN WE WALKED AROUND
THE NEIGHBORHOOD FOR A WHILE. I DIDN'T WANT
TO GET ANY BODY AROUND 22ND AND GLENWOOD
AREA CAUSE I KNEW TOO MANY PEOPLE AROUND
THERE. SO WE WENT TO 22ND AND SUSQUEHANNA
AND WENT TO SUSQUEHANNA AND VAN PELT. WENT
DOWN VAN PELT TO THE CORNER OF VAN PELT
AND DIAMOND. THEN WE WALKED TO TWENTY
SECOND AND DIAMOND. AND SAT ON THE
CORNER. THE COPS IN UNIFORM WERE ON THE
CORNER. A BEAT COP WAS TALKING TO TWO
OTHER COPS IN THE CAR. THEN THE COPS
IN THE CAR LEFT. WE WAITED FOR THE
BEAT COP TO LEAVE CAUSE WHEN WE

Leslie Earp

Continued ( )

H74-266 Darrell McKelvie H File075

INTERVIEW SHEET _     PAGE: ( 3 )     CASE # H74-266

NAME   LESLIE EARP

FIRST SAW THE COPS WE THREW THE SCREWDRIVERS BEHIND THE GULF GAS STATION AT VAN PELT AND DIAMOND. WE WENT BACK AND GOT THE SCREWDRIVERS AND WALKED UP CROSKEY STREET TO NORRIS THEN WE TURNED DOWN NORRIS TOWARDS TWENTY SECOND. THEN WE STOOD ON THE CORNER OF TWENTY SECOND AND NORRIS WAITING TO GET SOMEBODY FROM NORRIS STREET. THEN MUTT SEEN THIS GIRL AND HE STARTED TALKING TO HER WHILE I WATCHED HIS BACK. NOBODY CAME FROM NORRIS ST. SO MUTT AND I WENT BACK UP CROSKEY STREET TO THE PRO-JECTS. ABOUT A MINUTE AND A HALF LATER WE WERE GETTING READY TO GO INTO THE PROJECTS WHEN THE COPS STOPPED US THEN TO US TO St. JOSEPH HOSPITAL.

Q - WHAT WERE YOU AND MUTT GOING TO DO IF YOU CAUGHT SOME STRAGGLERS FROM NORRIS STREET?

A - STAB THEM

Q - WHO SHOT THE PEOPLE ON THE

Continued ( )

H74-266 Darrell McKelvie HFile076

Leslie Earp

INTERVIEW SHEET  PAGE: ( 4 )  CASE # H74-266

NAME LESLIE EARP

2300 BLOCK OF VAN PELT STREET THAT NIGHT? ONE DIED AND TWO WERE WOUNDED.

A- COOL DOG AND SLICK.

Q- WHY DO YOU SAY THEY DID IT?

A- CAUSE COOL DOG HAD THE ONLY PISTOL WE HAD. A 38' DETECTIVE SPECIAL. AND SLICK AND COOL DOG WERE HANGING TOGETHER ALL DAY AND WHEN ME AND MUTT ASKED FOR THE PISTOL ABOUT THE TIME IT WAS GETTING DARK, COOL DOG SAID THAT THEY WERE USING IT TONIGHT.

Q- WHY DID MUTT WANT THE GUN?

A- PROBABLY TO GO SHOOT SOMEBODY.

Q- WERE YOU THERE ON VAN PELT STREET IN THE 2300 BLOCK WHEN THOSE PEOPLE WERE SHOT?

A- NO.

Q- WHO IS MUTT? WHAT IS HIS FULL NAME AND ADDRESS?

A- DARRELL McKELVIE, I DON'T KNOW HIS ADDRESS.

Q- WHO IS COOL DOG AND SLICK? WHAT ARE THEIR REAL NAMES AND ADDRESSES?

A- COOL DOG IS BARRY BURTON ███████. I DON'T KNOW HIS REAL NAME. LIVES IN THE PROJECTS.

Continued ( )

Leslie Earp

INTERVIEW SHEET ___          PAGE: ( 5 )          CASE # H74-266

NAME  LESLIE EARP  ---

Q WHEN YOU AND MUTT WENT DOWN TO
GET SOMEBODY FROM NORRIS STREET.
DID THE REST OF YOUR GANG GO DOWN, TOO?
A- THEY DIDN'T GO DOWN WITH US, BUT I
KNEW THEY WERE GOING DOWN.
Q- DO YOU KNOW THE DEAD BOY?
A. I'M NOT SURE.
Q- ARE YOU WILLING TO TAKE A LIE
DETECTOR TEST?
A- YES.
Q. CAN YOU READ AND WRITE THE ENGLISH
LANGUAGE?
A. YES.
Q- HOW FAR DID YOU GO IN SCHOOL?
WHAT GRADE?
A. EIGHTH

Leslie Earp

Continued ( )

H74-266 Darrell McKelvie H File 078

39- Have you told me everything you know about the shooting death of Robert Davis? — Yes

34 Were you present when Robt. Davis was shot — No

33 Did you shoot Robt. Davis, causing his death — No

35 Regarding the death of Robt. Davis did you shot him — No

14 Are you deliberately trying to hold back any info about the shooting of Robt. Davis — No

Incl — Melendez

H74-266DarrellMcKelvieHFile079

Case 2:23-cv-02484-AB Document 1-5 Page 50 of 151 Filed 07/03/2023

Q- WHILE YOU WERE WALKING AROUND WITH MUTT IN THE AREA OF 22ND AND DAUPHIN AND GLENWOOD. DID YOU SEE ANY ONE?

A- AT 22ND AND GLENWOOD I SAW A LOT OF PEOPLE ON THE STEP OF THE CORNER HOUSE AT 23RD AND GLENWOOD. TWO BROTHER WHO I KNOW SAW US COMING AND RAN TO THE DOORWAY OF THE HOUSE. WE WALKED PAST THEM AND I SPOKE TO THEM. THEY CAME BACK DOWN WHEN THEY SAW IT WAS ME. THEN WE KEPT WALKING DOWN GLENWOOD AVE TOWARDS 21st St.

Q- WHY DID THE BOYS RUN FROM YOU?

A- I DON'T KNOW.

Q- DID YOU HEAR ANY GUN SHOTS AT THE TIME THE BROTHERS RAN UP THE STEPS.

A- NO.

Q- DID ANY BODY ELSE ON THE STEPS RUN ²⁄₁₀₀

A- I THINK EVERYBODY ON THE STEPS RAN INTO THE HOUSE THE BROTHERS.

Q- WHAT ARE THE BROTHERS NAMES AND WHERE DO THEY LIVE?

A- I FORGOT THEIR NAMES. THEY

Continued (    )

H74-266 Darrell McKelvie HFile080

INTERVIEW SHEET _      PAGE: ( )      CASE # _____

NAME _____

LIVE IN THE CORNER HOUSE OF 22ND
AND GLENWOOD. THEY ARE ABOUT 14 OR 16
Q ARE THEY FROM A GANG?
A - NOT THAT I KNOW OF.
Q - WAS THERE ANY GIRLS ON THR STEPS?
A - I SEEN SOME GIRL.
Q - WOULD YOU KNOW THE TWO BROTHERS IF
YOU SAW THEM AGAIN?
A - YEAH, I SAW THEM DOWN HERE THE
NIGHT IT HAPPENED.

Leslie Earp

# EXHIBIT 9

AKA "Cocky Dog"

## INTERVIEW SHEET

HOMICIDE DIVISION      CASE #74-266 INTERVIEWED BY *GRACE 887*

NAME *Barry Burton*    AGE *17*    RACE *NM* D.O.B. ▮▮▮▮

ADDRESS ▮▮▮▮▮▮▮▮    APT.# ▮   PHONE ▮▮▮

   SCHOOL
NAME OF EMPLOYMENT ▮▮▮▮▮    SOC.SEC.# ▮▮▮▮▮

   SCHOOL
ADDRESS OF EMPLOYMENT _____ PHONE _____

BROUGHT IN BY *Grace & Beswick*    DATE & TIME *Wed., 7-16-75, 6⁴⁵ AM*

PLACE OF INTERVIEW *Rm. 104, PAB.*    DATE & TIME *Wed. 7-16-75, 7⁵⁰ AM*

WE ARE QUESTIONING YOU CONCERNING: *THE HOMICIDE by SHOOTING OF ROBERT DAVIS 15-NM, THAT OCC. on SUN. 7-28-74 AT 10:15PM ON THE HWY. 2311 N. VAN PELT ST.*

WARNINGS GIVEN BY: *DET. GRACE 887* DATE & TIME *Wed., 7-16-75, 7⁴⁵ AM*

ANSWERS: (1) *YES* (2) *YES* (3) *NO* (4) *YES* (5) *YES* (6) *NO* (7) *YES*

Q. WE ARE QUESTIONING YOU CONCERNING THE HOMICIDE by SHOOTING OF ROBERT DAVIS THAT OCCURED on SUNDAY 7-28-74 AT About 10:15PM on the hwy 2311 N. VAN PELT ST. Do you understand?

A. Yes.

Q. Do you know DARRELL McKelvie AND Leslie Earp?

A. Yes.

████████████████████

Q. I READ you A STATEMENT THAT Leslie Earp gave the Police when

RECORD: YES _____    NO: _____    CHECKED BY _____

REVIEWED BY: *Barry Burton*

**INTERVIEW SHEET**      **PAGE: (2)**      **CASE #** H74-266

**NAME:** Barry Burton

he WAS ARRESTED on Monday 2-10-75 & CHARGED WITH the murder of ROBERT DAVIS, in which he denied the shooting, & STATED THAT you and A person NAMED Slick shot the boy on VAN PELT St. is that CORRECT?

A. Yes.

Q. Did you & Slick shoot Robert DAVIS?

A. No.

Q. Why would Leslie Earp say that you & Slick shot Robert Davis if you didn't do it?

A. He probably thought that we had the gun.

Q. Why would he think that you + Slick had A GUN?

A. He asked me for the gun the night the boy was shot, but I told him I didn't have it.

Q. What kind of a gun did he think you had?

A. A 38 caliber pistol.

Q. Did you ever have a .38 caliber pistol?

Barry Burton

Continued Page (3)

INTERVIEW SHEET        PAGE: (3)        CASE # 174-266

NAME: Barry Burton

A. No.

Q. Did you ever have any other kind of pistol or rifle?

A. I had a .22 pistol about a month before the boy was killed.

Q. What did you do with the .22 pistol?

A. I had it for a couple of days then I took it out and gave it to somebody from the gang I don't remember who it was.

Q. What is "Slicks" correct name, age & address?

A. Steven Harris, 17 yrs. old, he lives in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I don't know the address.

Q. Did you & Stephen Harris shoot the boy on Van Pelt St. on Sunday July 28, 1974 at about 10:15 PM?

A. No Sir.

Q. If you & Slick didn't shoot the boy, do you know who did?

A. I guess Earp & Mutt did it, I don't know.

Q. Are you willing to take a Polygraph test concerning what you have said?

A. Yes.

Continued Page

H74-266DarrellMcKelvieHFile008

Barry Burton

H74-266DarrallMcKelvieHFile009

Det Brady                    NSR

DIY/ tell R. Bold you were involved in the murder of Robt. Davis

DIY murder Robt Davis
DIY you see Robt Davis get murdered

At the very time Robt. Davis was murdered were you there

# EXHIBIT 10

INTERVIEW SHEET

H-74-266

HOMICIDE DIVISION    CASE # _____ INTERVIEWED BY _Bayle #761_

NAME _Evangeline Collins_ AGE _35_ RACE _N_ D.O.B. ████

ADDRESS ████████████ PHONE ████████

SCHOOL
NAME OF EMPLOYMENT _Housewife_    SOC.SEC.# _unk._

SCHOOL
ADDRESS OF EMPLOYMENT _____N/A_____ PHONE _N/A_

BROUGHT IN BY _self_    DATE & TIME _7-2-75  2:15 p.m._

PLACE OF INTERVIEW _104 PAB_    DATE & TIME _7-2-75  2:30 p.m._

WE ARE QUESTIONING YOU CONCERNING: _shooting death of Robert Davis 15 N/M_
_on 7-28-74 10 PM on the highway_
_2311 N. Van Pelt St._

WARNINGS GIVEN BY: _____ DATE & TIME _____

ANSWERS: (1)_____ (2)_____ (3)_____ (4)_____ (5)_____ (6)_____ (7)_____

Q. Mrs. Collins I understand you have additional information regarding this case that you want the police to know, will you tell me in your own words what that information is?

A. My son, Leslie Carp, has been arrested for this homicide and has been in jail since it happened and he didn't have anything to do with it. A witness named Edward Jackson 14 B/M who lives at ████████████████ informed me that he seen the shooting and that it was not my son who did the shooting.

RECORD: YES ___✓___    NO: _____ CHECKED BY _____

REVIEWED BY: _____

_Evangeline Collins_

D. MCKELVIE FED LIT 2022

INTERVIEW SHEET          PAGE: ( 2 )          CASE # 74-H-266

NAME: Evangeline Collins

Q  Did Edward give you an account of
   what did happen?

A. Yes.

Q  What did he tell you?

A. He was working at Frank's Candy store which is
   at Van Pelt + Susquehanna. He was
   putting out trash and there an alley
   next to candy store. He heard dogs
   barking in alley. He looked down at
   back of alley he seen some boys
   and they were making noise. Then he
   saw them leave alley and run out up
   towards Dauphin St. He heard a
   confrontation boys calling names bottles
   being thrown. He went to corner of Van
   Pelt St + looked up towards Dauphin St.
   when he observed boys running throwing
   things and things being thrown back.
   Then he observed one male leave the other
   boys run up to corner, with a gun
   point a handgun with both barrels,
   he observed boy ~~WAS E.C.~~ flu footed
   was wearing a "Cool Cap" turned
   backwards. He was wearing a shirt
   outside his pants, boy was extremely
   thin. Edward said a first shot

Continued Page ( )

Evangeline Collins

H74-266DarrellMcKelvieHFile051

RECEIVED BY SUPERIOR COURT H74-266... 0697

NAME: Evangeline Collins

let a pole. Then he heard about
five more shots and the guy was
shooting wild. I asked him if
he observed anyone fall + he told
me he seen a girl fall onto a trash
bag + holler "Mommy, Mommy."
I asked him if the girl was passed
to anyone or if anyone was shooting and
he told me that the male did all
the shooting.
I asked him what happened after
that — he said the male that did
the shooting ran towards Dauphin and
22ND St.
I asked him if he was sure there
wasn't anymore shooting and he said
no.
I asked him if he was sure that
it wasn't my son and he told me
he was sure.

Q. Did Edward give you the name of the
male he seen shooting?

A. No, I didn't want to press him.

E.C. ~~but told around neighborhood has~~
~~it that~~ "Lil Nard", ~~Roy Doty~~ (sea)   E.C.
told my son Leslie that "Cool Dog"

Continued Page ( )

Evangeline Collins

NAME: Evangeline Collins

and "Slick" were involved in the shooting.

Ray Doby told my son Larry that it was "Cool Dog" and "Slick" were involved in shooting.

Q Do you know their real names?

A No

Q Do you know where Lil Nard and Ray Dolby live?

A I just know they live in the 25th + Diamond St project.

Q When did Lil Nard tell Leslie this?

A Sometime in September 1974.

Q When did Ray Dolby tell Larry?

A Sometime last month.

Q Is there anything you wish to add to this statement?

A My son Leslie told me that he and McKelvie were in the area that night + these witnesses probably seen them and know they are members of Valley gang so they gave their names.

Evangeline Collins

H74-266DarrellMcKelvieHFile054

# EXHIBIT 11

INTERVIEW SHEET ___          PAGE: ( )          CASE # _____

NAME _____

Lil "Nard" AKA Bernard McNeil 16
told Ears last week with
Creek that Slick told him
after Nard came home from Forrest
Ears that Slick and Cool dog
did it.

Eddie Jackson 15 lives in projects
████████████
was supposed to be on the corner
when the shooting saw the shooter
was shooting wild bullets hit poles
etc. then ran thru the alley
is afraid to tell who did it
info from (Ears)

I N F O

Continued ( )
McKelvie Hill 140

# EXHIBIT 12

D. MCKELVIE
FED LIT 2022

EXTRACT OF CRIMINAL RECORD

CITY OF PHILADELPHIA
POLICE DEPARTMENT

PREPARED

DEC 7 1974

PHILA. NO.
481336

P.S.P. NO.

F.B.I. NO.

NAME
McKELVIE, Darrell Nathaniel

ALIASES

DATE OF BIRTH

ADDRESS

SEX
M

RACE
N

| ARRESTED | CHARGE | DISPOSITION | JUDGE |
|---|---|---|---|
| 10-19-73 22-77186 | 907-Poss Instr of Crime,M1 908-Proh. Offen. Weapon,M1 6106-Carry F/A W/O License,M1 6108-Carry F/A on Street | 1-2 Yrs Prob | Kumer |
| 7-29-74 22-51095 | Murder 2502 Poss Off. Weapon Crim Consp. | | |
| 7-29-74 22-51122 | Agg Asslt 2702 Simple Asslt 2701 Reck End Another 2705 Poss Inst Crime 902 Crim Consp 903 VUFA 6106 & 6108 | | |
| 7-29-74 22-51123 | Agg Asslt. 2702 Sim. Asslt 2701 Endan. Life of Anoth.2705 Poss Inst. Crime 902 Crim Consp 903 Vufa 6106 & 6108 | | |



PHILA POLICE DEPT
NAME DARRELL McKELVIE
DATE 7-29-74
AGE 18/M
ADDRESS
CRIME WILFULL KILLING
COMPLEX MBD
HEIGHT 5-9 WEIGHT 127 EYES DBN HAIR BLK BUILD MSLD3

H74-266 DarrellMcKelvieHFile014

*Indicates Arrest Not Supported by Fingerprints in F

75-10 (Rev. 9/38)

# EXHIBIT 13

INVESTIGATION REPORT PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | INITIAL (49) | X | Class. Change | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|
| 74 | 22nd | 22 51095 | SUPPLEMENTAL (52) | | Status Change | Hom. | 75 | |
| CLASSIFICATION | | CODE (14-17) | Continuation (51) | | Additional Info. | DISTRICT (8-9) | | SECTOR (10) |
| WILLFUL KILLING | | 111 | Sheet of | | Court Disposition | 22nd | | |

| PREVIOUS CLASSIFICATION | CODE | PLACE OF OCCURRENCE (18-34) | | | J.A.D. INVESTIGATIONS (35) Juvenile Offenders |
|---|---|---|---|---|---|
| | | 2311 N. Van Pelt St. | Inside | Out | 1. ☐ Male 2. ☐ Female 3. ☑ 1 Adult Offenders |

| COMPLAINANT (Use first names) (36-52) | AGE | RACE | ADDRESS | PHONE | TYPE OF PREMISES (53-55) |
|---|---|---|---|---|---|
| DAVIS, Robert Henry | 15 | N | | | Highway |

| DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|
| Sunday, 7/28/74 10:15 PM | Police | 22nd District |

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-66) | FOUNDED (66) | STATUS (67) 1. ☐ Active 2. ☐ Inactive – not cleared | 3. ☑ Arrest – cleared 4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|
| 7/28/74 | 7 | 10:15PM ☑ | Yes ☐ No | | | 75 |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious metals | 7. ☐ Autos A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED |
|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items / Furniture, Washers | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes ☐ No |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms | | | |

A. ORIGIN

    On Sunday, July 28, 1974, at 10:35 P.M., Corporal Rocks, Police Radio notified Sergeant Edward Brooks by phone that Robert H. Davis, 15-NM, ▮▮▮▮▮▮▮▮▮▮▮,was shot and killed on the highway, 2311 N. Van Pelt Street; Also shot were: Shelia Booker, 15-NF, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Left thigh), and Winston Burney, 15-NM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ tock).

B. ASSIGNMENT

1. **Homicide**: At 10:35 P.M., July 28, 1974, Detective Lawrence Grace #887 assigned by Sergeant Edward Brooks and he immediately proceeded to the Temple Hospital.

2. **Division**: Detective Douglas Culbreth #9068 assigned by Sergeant Edward McLaughlin #3540 of North Central Detective Division.

3. **Crime Lab**: Technician Joseph Roge and Policeman McKeever #7046 assigned by Sergeant Richard Fitzhenry in charge of Mobile Crime Detection Unit at 10:35 P.M., July 28, 1974.

C. SCENE

1. **Arrival**: Detectives Lawrence Grace and Gerald Ross arrived at the scene 2311 N. Van Pelt Street at 11:40 P.M., July 28, 1974.

2. **Present**: Detective Charles Andrews #9175, Homicide Division.
Detective James Bryson #853, North Central Detective Division.
Technician Joseph Roge, Mobile Crime Detection Unit.
Policeman McKeever #7045, Mobile Crime Detection Unit.

3. **Outside Description**

    Refer to Photographs and Sketch.

4. **Inside Description**: Does not apply.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Lawrence Grace #887 | Robert Snyder #8619 | John Malone #348 |

75-49 (Rev. 3/74)                   **DISTRICT FILE**         H74-266DarrellMcKelvieHFile041

D MC
IE
FF

INVESTIGATION REPORT PHILADELPHIA POLICE DEPARTMENT

| YR. DIST. OF OCCUR. | DC NO. (2-7) | INITIAL (49) | X | | Class. Change | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|
| 74 : 22nd | 22 : 51095 | SUPPLEMENTAL (52) | X | | Status Change | Hom. | 75 | |
| CLASSIFICATION CODE | | Continuation (51) | | | Additional Info. | DISTRICT (8-9) | | SECTOR (10) |
| WILLFUL KILLING 111 | | Sheet of | | | Court Disposition | | | |
| PREVIOUS CLASSIFICATION CODE | | PLACE OF OCCURRENCE (18-34) | | | (79) Inside Out | J.A.D. INVESTIGATIONS (35) Juvenile Offenders | | |
| | | | | | | 1. Male 2. Female 3. Adult Offenders | | |

| COMPLAINANT (Use firm name) (36-52) | AGE | RACE | ADDRESS | | PHONE | TYPE OF PREMISES (53-55) |
|---|---|---|---|---|---|---|
| DAVIS, Robert Henry | 15 | N | | | | |

DATE AND TIME REPORTED — REPORTED BY — ADDRESS

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-67) | FOUNDED (66) Yes No | STATUS (67) 1. Active 2. Inactive – not cleared | 3. Arrest – cleared 4. Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. Currency, Bonds, etc. | 4. Jewelry, Precious Metals | 7. Autos A. Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED |
|---|---|---|---|---|---|---|
| | 2. T.V., Radio, Stereo | 5. Household Items (Furniture, Washers) | 8. Clothing B. Misc. | $ | $ | Yes No |
| | 3. Office Equipment | 6. Consumer Items (Liquor, Cigarettes, etc.) | 9. Firearms | | | |

C. <u>SCENE:</u> (Continued)

   5. <u>Body</u>

   The deceased was identified as Robert Henry Davis, 15-NM, ███████████████████████████████████████████ at 11:00 P.M., July 28, 1974, inside the Accident Ward of Temple Hospital. He had been pronounced dead at 10:31 P.M., July 28, 1974, by Dr. Rosenheim.

   6. <u>Crime Lab</u>

   (a) <u>Direction:</u> Technician Joseph Roge and Policeman McKeever were directed at the crime scene by Detective Bryson to take a total of seven (7) photographs; also make sketch of scene, preserve evidence found at scene and submit same.

   (b) <u>Latent Prints:</u> None Lifted.

   (c) <u>Other Action:</u> None.

   7. <u>Operation and Supervision</u>

   This case was investigated under the direct supervision of Sergeant Edward Brooks #327.

D. <u>INTERVIEWS</u>

   <u>Police Officers</u>

   1. Policeman Robert Lindehofen #4239, 22nd District, interviewed by Detective Mozzachio #728 on July 28, 1974.

   See Interview #1.

   2. Policeman Paul Stanley #6633, Juvenile Aid Division.

   See Interview #2.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Lawrence Grace #887 | Robert Snyder #8619 | John Malone #348 |

75-49 (Rev. 3/74)

DISTRICT FILE

H74-266DarrellMcKelvieHFile042

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | | | | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 74 | 22nd | 22 | 51095 | | INITIAL (49) | ☐ Class. Change | Hom. | 75 | |

| | | | | X SUPPLEMENTAL (52) | ☐ Status Change | | | |
| CLASSIFICATION | | CODE (14-17) | | Continuation (51) | ☐ Additional Info. | DISTRICT (8-9) | | SECTOR (10) |
| WILLFUL KILLING | 111 | Sheet of | ☐ Court Disposition | | |

| PREVIOUS CLASSIFICATION | CODE | PLACE OF OCCURRENCE (18-34) | (70) | J.A.D. INVESTIGATIONS (35) Juvenile Offenders |
| | | ☐ Inside ☐ Out 1. ☐ Male 2. ☐ Female 3. ☐ Adult Offenders |

| COMPLAINANT (Use firm name) (36-52) | AGE | RACE | ADDRESS | PHONE | TYPE OF PREMISES (53-55) |
|---|---|---|---|---|---|
| DAVIS, Robert Henry | 15 | N | ███████████████ | | |

| DATE AND TIME REPORTED | REPORTED BY | ADDRESS |

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-63) | FOUNDED (66) ☐ Yes ☐ No | STATUS 1. ☐ Active 2. ☐ Inactive – not cleared | 3. ☐ Arrest – cleared 4. ☐ Exceptionally cleared | UNIT |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. 2. ☐ T.V., Radio, Stereo 3. ☐ Office Equipment | 4. ☐ Jewelry, Precious metals 5. ☐ Household Items (Furniture, Washers) 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos 8. ☐ Clothing 9. ☐ Firearms | A. ☐ Furs B. ☐ Misc. | PROPERTY VALUE (69-73) $ | RECOVERED VALUE (74-78) $ | INSURED ☐ Yes ☐ No |

D. **INTERVIEWS**

   Eye Witnesses

3. Creamer, Kevin, 13-NM, ███████████████, interviewed by Detective
   Mozzachio #728 on July 29, 1974.

   See Interview #3.

4. Jones, Darwin, 15-NM, ███████████████ iewed by Detec-
   tive Lynch #784 on July 29, 1974.

   See Interview #4.

5. Burney, Winston, 15-NM, ███████████████ viewed by De-
   tective Lafferty #9017 on July 29, 1974.

   See Interview #5.

6. Hines, Rodney, 13-NM, ███████████████ interviewed by Detective
   Charles Andrews #9175 on July 29, 1974.

   See Interview. C#6.

7. Beard, Rickey, 16-NM, ███████████████ interviewed by De-
   tective Lynch #784, South Detective Division on July 29, 1974.

   See Interview. C#7.

8. Corbitt, Stanley, 15-NM, ███████████████ interviewed by De-
   tective Lynch #784, South Detective Division, on July 29, 1974.

   See Interview #8.

   Informative Witnesses

9. Cleveland, Louis, 17-NM, ███████████████, interviewed by
   Detective Andrews #9175 on July 29, 1974.

   See Interview. C#9.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Lawrence Brace #887 | Robert Snyder #8619 | John Malone #348 |

75-49 (Rev. 4/74)  **DISTRICT FILE**  H74-266DarrellMcKelvieHFile043

Case: 23-22-24037 Document 1 memo Page File 09/Date Filed 07/03/2023

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | | | | DIST./UNIT PREPARING | CODE (11–12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 74 | 22nd | 22 51095 | X | INITIAL (49) | | ☐ Class. Change | Hom. | 75 | |
| | | | | SUPPLEMENTAL (52) | | ☐ Status Change | DISTRICT (8–9) | | SECTOR (10) |
| CLASSIFICATION | | CODE (14–15) | | Continuation (51) | | ☐ Additional Info. | | | |
| WILLFUL KILLING | | 111 | | Sheet of | | ☐ Court Disposition | | | |
| PREVIOUS CLASSIFICATION | | CODE | | PLACE OF OCCURRENCE (18–34) | | (79) | J.A.D. INVESTIGATIONS (15) Juvenile Offenders | | |
| | | | | | | ☐ Inside ☐ Out | 1. ☐ Male 2. ☐ Female 3. ☐ Adult Offenders | | |

| COMPLAINANT (Use firm name) (36–52) | AGE | RACE | ADDRESS | | PHONE | TYPE OF PREMISES (33–35) |
|---|---|---|---|---|---|---|
| DAVIS, Robert Henry | 15 | N | ██████████ | | | |
| DATE AND TIME REPORTED | | | REPORTED BY | | ADDRESS | |

| DATE OF OCCURRENCE (56–61) | DAY CODE (62) | TIME (61–63) | FOUNDED (66) | STATUS (67) | 1. ☐ Active | 3. ☐ Arrest – cleared | UNIT |
|---|---|---|---|---|---|---|---|
| | | | ☐ Yes ☐ No | | 2. ☐ Inactive – not cleared | 4. ☐ Exceptionally cleared | |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious metals | 7. ☐ Autos | A. ☐ Furs | PROPERTY VALUE (69–73) | RECOVERED VALUE (74–78) | INSURED |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing | B. ☐ Misc. | $ | $ | ☐ Yes ☐ No |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms | | | | |

D. **INTERVIEWS:** (Continued)

   **Informative Witnesses:** (Continued)

   10. Hines, Nathaniel, 16-NM, ███████████████, interviewed by Detective Francis Lafferty #9017 on July 29, 1974.

      See Interview. C#10.

E. **DEFENDANT #1**

   1. **Arrest**

      McKelvie, Darrell, 18-NM, ███████████████████ Occupation: Student. Born: 8/25/55. Taken into custody on the highway, 23rd and Norris Streets at 10:35 P.M., July 28, 1974, by Policemen Bresnahan #1355 and Smith #5389 and brought to North Central Detective Division and Homicide Division.

   2. **Description**

      Darrell McKelvie is an 18 year old negro male, 5'9" tall, 127 pounds, dark brown eyes, black short cropped hair, slender build, medium brown complexion. He is wearing white T-shirt (short sleeves) dark blue or black trousers, white sneakers (high top) black jeff cap. He does not appear to be under the influence of narcotics or alcohol, and has no visible injuries, nor does he complain of any injuries.

   3. **Interview**

      The defendant, Darrell McKelvie, after being warned of his constitutional rights by Detective Lawrence Grace #887 and advised of the charges against him, requested an attorney and declined to make a statement, at 2:20 A.M., Monday, July 29, 1974.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Lawrence Grace #887 | Robert Snyder #8619 | John Malone #348 |

75-49 (Rev. 8/74)

DISTRICT FILE

H74-266DarrellMcKelvieHFile044

# Attachment B:

# Prior 28 U.S.C. § 2254 petitions

# Note: This attachment does not include Petitioner's 1985 petition for writ of habeas corpus as undersigned counsel was unable to obtain a copy.

# B-1
# 1985 Docket

| DIST. | OFF. | | YR. | NUMBER | M | DAY | YEAR | | | | | Nearest $1,000 | MAG. NO. | | DEM. | YR. | NUMBER |
|-------|------|--|-----|--------|---|-----|------|--|--|--|--|----------------|----------|--|------|-----|--------|
| 313   | 2    |  | 85  | 2083   | 04| 15  | 85   | 3| 530| | 5 | | J 1336JM M | 42041 | | 85 | 2083 |

| PLAINTIFFS | | DEFENDANTS |
|------------|--|------------|
| McKELVIE, DARRELL M. | v | FREEMAN, ROBERT M. and ATTORNEY GENERAL OF PENNSYLVANIA |

and

THE DISTRICT ATTORNEY OF PHILADELPHIA
COUNTY (#3)

JASON

Habeas Corpus

CAUSE

(CITE THE U.S. CIVIL STATUTE UNDER WHICH THE CASE
IS FILED AND WRITE A BRIEF STATEMENT OF CAUSE)

---

**ATTORNEYS**

Darrell M. McKelvie, F-5156
P.O. Box 200
Camp Hill, PA 17011

THE DISTRICT ATTORNEY OF PHILA. COUNTY
by:  ~~Andrew Rogoff, Esq.~~ (#6)
1300 Chestnut Street
Phila. Pa. 19107
Donna G. Zucker, Esq.

---

| CHECK HERE IF CASE WAS FILED IN FORMA PAUPERIS | FILING FEES PAID | | | STATISTICAL CARDS | |
|---|---|---|---|---|---|
| | DATE | RECEIPT NUMBER | C.D. NUMBER | CARD | DATE MAILED |
| | | | | JS-5 | |
| | | | | JS-6 | 10/85 |

C 111A
Rev. 1/75)

MAG. SCUDERI (#2)

**CIVIL DOCKET CONTINUATION SHEET**

| PLAINTIFF | DEFENDANT | |
|---|---|---|
| DARRELL M. McKELVIE | ROBERT M. FREEMAN et al | DOCKET NO. 85-2083 |
| | | PAGE ____ OF ____ PAGES |

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 1985 | | |
| 1 APR | 15 | Original record together with certified copy of docket entries from U.S. District Court, Middle District of Pa., filed. |
| 2 MAY | 3 | ORDER THAT MAG. PETER B. SCUDERI IS DESIGNATED TO HEAR THE PLTF'S PETITION FOR HABEAS CORPUS, FILED. |
| | | 5/6/85 entered & copies mailed |
| 3 " | 9 | ORDER THAT THE DISTRICT ATTY. OF PHILA. CO. IS ADDED AS A PARTY RESPONDENT ETC., AND SHALL FILE AN ANSWER WITHIN 20 DAYS ETC., THE CLERK OF THE QUARTER SESSIONS COURT OF PHILA. CO. SHALL FILE WITH THE CLERK OF THIS COURT COPIES OF ALL RECORDS, ETC., WITHIN 20 DAYS, FILED. |
| | | 5/10/85 entered & copies mailed |
| 4 " | 28 | DEFT'S MOTION FOR ENLARGEMENT OF TIME TO FILE RESPONSE, CERTIFICATE OF SERVICE, FILED. |
| (4) " | 31 | ORDER DATED 5/29/85 THAT RESPONDENTS' TIME FOR FILING A RESPONSE IS EXTENDED TO 6/28/85, FILED. |
| | | 6/3/85 entered & copies mailed |
| -- JUN | 10 | Original state court records from Court of Common Pleas of Phila. Co. referred to Mag. Scuder. |
| 5 " | 28 | Response of the District Atty. of Phila. to petition for writ of habeas corpus, filed. |
| 6 AUG | 16 | Withdrawal of appearance of Andrew R. Rogoff, Esq. and appearance of Donna G. Zucker, Esq. for respondents, filed. |
| 7 OCT | 8 | REPORT AND RECOMMENDATION THAT THE PETITION FOR WRIT OF HABEAS CORPUS BE DNIED. THERE IS NO PROBABLE CAUSE FOR APPEAL, FILED.                    pbs |
| | | 10/8/85 enterd d & copies mailed |
| (7) " | 29 | ORDER THAT THE REPORT AND RECOMMENDATION IS APPROVED AND ADOPTED. THE PETITION FOR A WRIT OF HABEAS CORPUS IS DENIED.  THERE IS NO PROBABLE CAUSE FOR APPEAL, FILED. |
| | | 10/30/85 entered & copies mailed. |
| 1988 | | |
| 8 SEP | 6 | Receipt re:  return of state court record, filed. |

| CONST. NO. | DOCKET NUMBER | FILING DATE MO DAY YEAR | N/S | O | D PTF DEF | CV-85 | 0319 | DOCKET NUMBER |
|---|---|---|---|---|---|---|---|---|
| 0314/3/1 | 85 | 0319 | 3 6 85 | 3 530 | 1 | | 42041 | CLOSED 4/9/85 |

TERMAN

3 5 30

1,000

1409

M

(Pro Se)  PLAINTIFFS  TREATMENT  (Lenahan)  DEFENDANTS

| MC KELVIE, DARRELL M.,

JM

| FREEMAN, ROBERT M., & ATTY. GENERAL OF PA



CA 85-2083
E.D. of Pa

CAUSE

(CITE THE U.S. CIVIL STATUTE UNDER WHICH THE CASE
IS FILED AND WRITE A BRIEF STATEMENT OF CAUSE)

28 U.S.C. 2254 - Habeas Corpus

ATTORNEYS

Darrell m. McKelvie, F-5156
P.O. Box 200
Camp Hill, PA  17011

Certified from the record

Date.....4/12/85......

Donald R. Berry, Clerk

Per.....[signature].....

Deputy Clerk

| CHECK HERE CASE WAS FILED IN PHMA | FILING FEES PAID | STATISTICAL CARDS |
|---|---|---|
| DATE | RECEIPT NUMBER | C.D. NUMBER | CARD | DATE MAILED |

# CV-85 0319

| DATE 1985 | NR. | PROCEEDINGS |
|---|---|---|
| MAR.6 | 1 | PETITION — for Writ of H.C. |
| Mar.6 | 2 | AFF/DECL — of petitioner in support of request to proceed in forma pauperis with certificate attached stating he has $42.78 in his prison account. |
| Mar.6, " " | | NOTICE — and consent form re Magistrate referral mailed to petitioner. J.S. 5 copy docket to Judge Herman |
| Apr 3 | 3 | MEMO/ORDER — Plf is challenging his conviction and sentence imposed by the Court of Common Pleas of Phila County, Pa. THEREFORE, IT IS ORDERED THAT: The Clerk of Court transfer this case to the US District Court for the Eastern District of Pennsylvania. Copy to Court, Lenahan, McKelvie, orig. in Sec. |
| Apr 9 | | CASE FILE — transferred to the ED of Pa. with certified copy of Memo and Order transferring case and cert. copy of docket entries. (Orig. Order in security, c/c in file). Letter of Transmittal to McKelvie, Lenahan, & Court. |
| Apr 9 | | J.S. 6 Temp |

**B-2**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FORM FOR USE IN APPLICATIONS FOR HABEAS CORPUS UNDER 28 USC §2254

(eff. 6/16/99)

Darrell N. McKelvie
_____ PETITIONER

(Full name) (Include name under which you were convicted)

vs.

CASE NO. 00cv3109

(supplied by the Court)

Superintendent Mary Leftridge-Byrd

RESPONDENT

FILED

(Name of Warden, Superintendent, Jailor, or authorized
person having custody of petitioner)
and

JUL - 6 2000

THE DISTRICT ATTORNEY OF THE COUNTY OF ___Philadelphia

and

MICHAEL E. KUNZ, Clerk

THE ATTORNEY GENERAL OF THE STATE OF ___Pennsylvania ___ Dep. Clerk

ADDITIONAL RESPONDENT

Darrell N. McKelvie         AF-5156

Name                        Prison Number

SCI-Chester

Place of Confinement

(If petitioner is attacking a judgment which imposed a
sentence to be served in the future, petitioner must fill in the
name of the state where the judgment was entered. If petitioner
has a sentence to be served in the future under a federal
judgment which he wishes to attack, he should file a motion under
28 U.S.C.§2255, in the federal court which entered the judgment.)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### INSTRUCTIONS - READ CAREFULLY

1. This petition must be legibly handwritten or typewritten and
signed by the petitioner. Any false statement of a material fact
in this petition or in a motion for leave to proceed in forma
pauperis may serve as the basis for prosecution and conviction
for perjury. All questions must be answered concisely in the

1

proper space on the form. Where more room is needed to answer any question use reverse side of sheet.

2. Additional pages are not permitted. No citation of authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

3. Upon receipt of a fee of $5.00, your petition will be filed if it is in proper order.

4. If you do not have the entire necessary filing fee, you may request permission to proceed in forma pauperis, in which event you must complete the form on the pages eleven and twelve, setting forth information establishing your inability to prepay the full fees and costs or give security therefor. If you wish to proceed in forma pauperis, you must submit an affidavit stating all your assets, and the certification on page thirteen, signed by an authorized prison official. Discharge of debt in a bankruptcy proceeding shall not include a filing fee (or associated costs and expenses), regardless of an assertion of poverty by the debtor or the debtor's status as a prisoner.

5. Only judgments entered by one court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

6. Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the petition you file seeking relief from any judgment of conviction.

7. All state remedies must be exhausted before filing a claim under 28 U.S.C. 2254, however, if a prisoner files such a claim before exhausting all state remedies, the federal court has authority to deny it on its merits. A federal court, when considering a state prisoner's habeas corpus petition, must deem as correct a determination of a factual issue made by a state court, unless the prisoner rebuts the presumption by clear and convincing evidence. If a petitioner has failed to develop the factual basis of the claim in state court proceedings, a federal court shall not hold an evidentiary hearing on a habeas corpus claim unless the prisoner shows that:

2

(1) the claim relies on either a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, or a factual predicate that could not have previously been discovered through the exercise of due diligence; and

(2) the facts underlying the claim be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the prisoner guilty.

8. There is a one-year statute of limitations for filing petitions pursuant to 28 U.S.C. 2254.

9. Federal courts must dismiss claims in a second or successive petition that were presented in a prior petition.

10. Federal courts must dismiss claims in a second or successive petition that were not presented in a prior petition unless:

(1) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(2) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, and the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the petitioner guilty.

Before such a second or successive petition may be filed in the district court, however, the petitioner must move the court of appeals for an Order authorizing the district court to consider the petition. Petitioner's motion for such an Order must be determined by a three judge panel of the court of appeals, which must grant or deny the motion within 30 days. The court of appeals may grant the motion only if it determines that the petition makes a prima facie showing that it satisfies either (1) or (2) above.

11. Ineffectiveness of counsel during post-trial proceedings in state court shall not be grounds for relief under 28 U.S.C. 2254.

12. When the petition is fully completed, the original and four copies must be mailed to the Clerk of the United States District Court whose address is ROOM 2609, 601 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19106.

3

Case: 23-2248 Document: 1 Page: 120 Date Filed: 07/13/2023

13. Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

## PETITION

1. (a) Name and location of court which entered the judgment of
conviction under attack: Court Of Common Pleas, Philadelphia Coun
    (b) Name of Prosecutor: _____ Mr. John Carpenter
    (c) Prosecution conducted by District Attorney's Office of
_____ Philadelphia _____ County

2. (a) Date of Judgment of conviction: _____ January 28, 1975 _____

    (b) Indictment number or numbers: #987, 988, 989, 992

    Term: October 1974 _____ Criminal Case Number: 74-07-3250 to 3252

3. Length of sentence: _____ Life _____ Sentencing Judge: E. Gelfand

4. Nature of offense or offenses for which you were convicted:

    Murder, Aggravated Assault, Conspiracy, Simple Assault

5. What was your plea? (check one)
    (a) Not Guilty (x)    (b) Guilty ( )    (c) Nolo contendere ( )
    If you entered a guilty plea to one count or indictment, and
    a not guilty plea to another count or indictment, give
    details: _____

6. Kind of trial: (check one)
    (a) Jury (x)    (b) Judge only ( )

7. Did you testify at the trial?   Yes ( )  No (x)

8. Did you appeal from the judgment of conviction?
     Yes (x) No ( )

9. If you did appeal, answer the following:

5

(a) **Name of court:** Court Of Common Pleas Of Philadelphia.

(b) **Result:** Denied

(c) **Date of Result:** April 22, 1975

If you filed a second appeal or filed a petition for certiorari in the Supreme Court, give details: On May 8, 1975

trial counsel filed to the Supreme Court.

10. **Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?**

                    Yes (X)      No ( )

11. **If your answer to 10 was "yes", give the following information:**

(a) (1) **Name of Court:** Court Of Common Pleas, Philadelphia

   (2) **Nature of proceeding:** P.C.R.A.

   (3) **Grounds raised:** Ineffective Assistance Of Counsel

   (4) **Did you receive an evidentiary hearing on your petition, application or motion?**

                    Yes (X)      No ( )

   (5) **Result:** Denied

(6) Date of result: _____ December 6, 1979 _____

  (b) As to any second petition, application or motion give the same information:

  (1) Name of Court: Court Of Common Pleas, Philadelphia

  (2) Nature of proceeding: P.C.R.A.

  (3) Grounds raised: Identification

  (4) Did you receive an evidentiary hearing on your petition, application or motion?
      Yes ( )    No (X)

  (5) Result: Denied

  (6) Date of result: _____ January 25, 1995 _____

  (c) As to any third petition, application or motion, give the same information:

  (1) Name of Court: _____

  (2) Nature of proceeding: _____

  (3) Grounds raised: _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

        Yes ( ) No ( )

(5) Result: _____

(6) Date of Result: _____

(d) Did you appeal to the highest state court having jurisdiction the result of any action taken on any petition, application or motion:

| | |
|---|---|
| (1) First petition, etc. | Yes (x) No ( ) |
| (2) Second petition, etc. | Yes (x) No ( ) |
| (3) Third petition, etc. | Yes ( ) No ( ) |

(e) If you did <u>not</u> appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12. State <u>concisely</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground.

    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your state court remedies, you should set them forth in this petition if you wish to seek federal relief. If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

    For information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all you state court remedies with respect to them. However, <u>you should raise in this petition all available grounds</u> (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

If you select one or more of these grounds for relief, you must allege facts in support of the ground or grounds which you choose. Do not check any of the grounds listed below. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: Conviction obtained by use of coerced confession by witnesses and because of a confrontation that accured in the identification process. Supporting FACTS (tell your story briefly without citing cases or law): Because of the ages of the witnesses at the time , which was from 12 to 15 years of age.  And the fact that the detectives took these children to the police station immediately after the shooting, without their parents or legal guardians consent, coerced these children in what to say. See attached Brief In Support.

B. Ground two: Conviction obtained by use of false identification

pursuant to an unlawful arrest. Please see Brief In Support.

**Supporting FACTS (tell your story _briefly_ without citing cases or law:**
There was no reason for petitioner to be stopped by the police. Although

petitioner was about 4 blocks away from the shooting when stopped by the police

who were looking for two black males armed and wearing flower shirts. Petitioner

did not fit this discription nor did petitioner tried to run from the police

when stopped. Witnesses also stated that it was too dark to identify anyone.

    **C. Ground three:** Conviction obtained by the unconstitutional failure of

the prosecution to disclose to the defendant evidence favorable to the defendant.

**Supporting FACTS (tell your story _briefly_ without citing cases or law:**
Prosecution knew of the coercion by the detective to the witnesses after review-

ing the notes of testimony from the Municipal Court transscripts and the Sup-

pression Hearing transcripts. Prosecution forced their lead witnesses and at

one time threatened him to testify against petitioner or they would take action

against him, Mr. Darwin Jones. (Please see attached Brief in Support)

    **D. Ground four:** Denial of effective assistance of counsel. Please

See Brief In Support.

**Supporting FACTS (tell your story _briefly_ without citing cases or law:**
Trial Court did abuse it's discretion in denying defendant's counsel a short

continuance to enable him to obtain the suppression hearing transcripts for

use in cross-examining the witnesses at trial. If defense counsel would of

been allowed to review the suppression hearing transcripts, the contradicting

testimony and statements would of shown the jury that the witnesses were coerced.

10

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them:

GROUND THREE WAS NOT PRESENTED; because in 1991 petitioner just

received all of his transcripts, and in June of 1995, petitioner

received an affidavit from Mr. Darwin Jones explaining what

really happen that night.

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
             Yes ( )   No (x)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
        (a) At preliminary hearing: Ronald F. Kidd, 2070 Lott Ave

    Philadelphia, Pa. 19115

        (b) At arraignment and plea: Ronald F. Kidd, 2070 Lott Ave.

        (c) At trial: Ronald F. Kidd, 2070 Lott Ave., Phila, Pa. 19115

        (d) At sentencing:  Ronald F. Kidd, 2070 Lott Ave. Phila, Pa.

        (e) On appeal:  Ronald F. Kidd, 2070 Lott Ave., Phila, Pa.

        (f) In any post-conviction proceeding:   Mr. Kalvin Kahn,

    526 S. 45th Street, Philadelphia, Pa. 19104

        (g) On appeal from any adverse ruling in a post-conviction proceeding:

11

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?   Yes (x)   No ( )

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
        Yes (x)   No ( )

        (a) If so, give name and location of court which imposed sentence to be served in the future:

Court Of Common Pleas Of Cumberland County,  Cumberland County

Courthouse,  Carlise, Pa.  17013
        (b) And give date and length of sentence to be served in future:
1 to 7 year sentence was received on February 11, 1992

        (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?       Yes (x)  No ( )


        I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _July 3, 2000_      _Darrell McKelvie_
                                    Signature of Petitioner


_____
        Signature of Attorney (if any)


12

**Affidavit Accompanying Motion for Permission to Proceed in the District court and/or on Appeal in Forma Pauperis in Habeas Corpus Cases under 28 U.S.C. Sections 2241 and 2254.**

### United States District Court for the Eastern District of Pennsylvania

FILED

Darrell McKelvie
(Plaintiff)
    V.

Mary Leftridge-Byrd
(Defendant(s))

JUL - 6 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

District Court Case No. 00 - CV - 3409

---

Affidavit in Support of Motion

    I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)

Signed: *Darrell McKelvie*

**Instructions**

**Complete all questions in the application and then sign it. Do not leave any blanks. If the answer to a question is "O," "none," or "not applicable (N/A)," write in that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.**

**Date:** July 3, 2000

---

**My issues are:**

_____

_____

_____

**1. For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months.  Adjust any amount that was received weekly, quarterly, semiannually, or annually to show the monthly rate.  Use gross amounts, that is, amounts before any deductions for taxes or otherwise.**

| Income source | Average monthly amount during During the past 12 months | Amount expected Next month |
|---|---|---|
| | **You** | **You** |
| **Employment** | $ N/A | $ N/A |
| **Self-employment** | $ N/A | $ N/A |
| **Income from real property (such as rental income)** | $ N/A | $ N/A |
| **Interest and Dividends** | $ N/A | $ N/A |
| **Gifts** | $ N/A | $ N/A |
| **Alimony** | $ N/A | $ N/A |
| **Child Support** | $ N/A | $ N/A |
| **Retirement (such as social security, pensions, annuities, insurance)** | $ N/A | $ N/A |
| **Disability (such as social security, insurance payments)** | $ N/A | $ N/A |
| **(Unemployment payments** | $ N/A | $ N/A |
| **Public Assistance (such as welfare)** | $ N/A | $ N/A |
| **Other specify):** | $ N/A | $ N/A |
| **Total monthly income:** | $ N/A | $ N/A |

**2. List your employment history, most recent employer first.  (Gross monthly pay is before taxes or other deductions.)**     N/A

14

| Employer | Address | Dates of employment | Gross monthly pay |
|----------|---------|---------------------|-------------------|
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |

**3. List your spouse's employment history, most recent employer first. (Gross monthly pay is before taxes or other deductions.)**

| Employer | Address | Dates of employment | Gross monthly pay |
|----------|---------|---------------------|-------------------|
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |

**4. How much cash do you and your spouse have?**        $    N/A

Below, state any money you or your spouse have in bank accounts or in any other financial institution.

| Financial Institution | Type of account | Amount you have | Amount your spouse Has |
|-----------------------|-----------------|-----------------|------------------------|
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |

If you are a prisoner, you must attach a statement _certified by the appropriate institutional officer_ showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account

**5. List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.**

15

| Home (Value) | Other estate | Real (Value) |
|---|---|---|
| N/A | N/A | |
| N/A | N/A | |
| N/A | N/A | |

**Motor Vehicle #1**
Value _____ N/A _____
Make & Year _____ N/A _____
Model: _____ N/A _____
Registration #: _____ N/A _____

**Motor vehicle #2**
Value _____ N/A _____
Make & year: _____ N/A _____
Model: _____ N/A _____
Registration # _____ N/A _____

| Other Assets | Value of other assets |
|---|---|
| N/A | N/A |
| N/A | N/A |
| N/A | N/A |

**6. State every person, business, or organization owing your or your spouse money, and the amount owed.**

| Person owing you or your Spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| N/A | N/A | N/A |
| N/A | N/A | N/A |
| N/A | N/A | N/A |

**7. State the persons who rely on you or your spouse for support.**

| Name | Relationship | Age |
|---|---|---|
| N/A | N/A | N/A |
| N/A | N/A | N/A |
| N/A | N/A | N/A |

16

**8. Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate:**

|  | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (include lot rented for mobile home) | $ N/A | $ N/A |
| Are real-estate taxes included? | Yes N/A | No N/A |
| Is property insurance included: | Yes N/A | No N/A |
| Utilities (electricity, heating fuel, water, sewer and Telephone) | $ N/A | $ N/A |
| Home maintenance (repairs & upkeep) | $ N/A | $ N/A |
| Food | $ N/A | $ N/A |
| Clothing | $ N/A | $ N/A |
| Laundry & Dry-Cleaning | $ N/A | $ N/A |
| Medical and dental expenses | $ N/A | $ N/A |
| Transportation (not including motor vehicle payments) | $ N/A | $ N/A |
| Recreation, entertainment, newspapers magazines, etc. | $ N/A | $ N/A |
| Insurance, not deducted from wages or included in Mortgage payments) | $ N/A | $ N/A |
| Homeowner's or renter's |  |  |
| Life | $ N/A | $ N/A |
| Health | $ N/A | $ N/A |
| Motor Vehicle | $ N/A | $ N/A |
| Other: | $ N/A | $ N/A |
| Taxes (not deducted from wages or included in mortgage payments) (specify): N/A |  |  |
| Installment payments | $ N/A | $ N/A |
| Motor Vehicle | $ N/A | $ N/A |
| Credit card | $ N/A | $ N/A |
| (Name) N/A |  |  |
| Department store (Name): N/A | $ N/A | $ N/A |
| Other N/A | $ N/A | $ |
| Alimony, maintenance, and support |  |  |
| Paid to others | $ N/A | $ N/A |
| Regular expenses for operation of |  |  |

17

business, profession, or farm (attach detailed statement)    $ _____ N/A _____    $ _____ N/A _____

**TOTAL MONTHLY EXPENSES:**    $ _____ N/A _____    $ _____ N/A _____

**9.  Do you expect any major changes in your monthly income or expenses or in your assets or liabilities during the next 12 months?**

Yes _____    No _x_    If yes, describe on an attached sheet.

**10. Have you paid or will you be paying an attorney any money for services in connection with this case, including the completion of this form?  Yes ___  No _x_**
If yes, state the attorney's name, address, and telephone number:

_____

_____

_____

**11.  Have you paid - or will you be paying- anyone other than an attorney (such as a paralegal or typist) any money for services in connection with this case, including the completion of this form?**

Yes _x_  No _____

 If yes, how much?    $75.00 to 100.00

If yes, state the person's name, address, and telephone number:

_____

_____

**12. Provide any other information that will help explain why you cannot pay the docket fees for your appeal.**

   I will have to pay for coping and postage cost, ect.

**13. State the address of your legal residence.**
   State Correctional Institution at Chester
   500 E. 4th Street, Chester, PA 19013

Your daytime phone number: _____

Your age: _____ 44 _____ Your years of schooling: _____ 10 _____

Your Social Security number: 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 _____

I declare under the penalty of perjury that the foregoing is true and correct:

*Darrell N. McKelvie*

Petitioner's signature

Executed on *July 3, 2000*

(DATE)

19

## CERTIFICATION

I hereby certify that the petitioner herein has the sum of $ 200.17 on account to his credit at the SCI - Chester Institution where he is confined. I further certify that petitioner likewise has the following securities to his credit according to the records of said _____ Institutions: _____

_____
_____
_____

*Richard W. Johnson*

AUTHORIZED PRISON OFFICIAL

4/28/00

DATE

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRELL N. McKELVIE
               PETITIONER       :

      VS.                       :

MARY LEFTRIDGE-BYRD         :
               RESPONDENT

BRIEF IN SUPPORT OF
<u>WRIT OF HABEAS CORPUS UNDER 28 USC §2254</u>

Submitted by,

Darrell N. McKelvie
Pro se Petitioner
AF-5156
500 E. 4th Street
Chester, Pa. 19013

Dated: July 3, 2000

# TABLE OF CONTENTS

PAGES

Table Of Citation .......................................2

Petitioner Brief In Support.............................3-16

Exhibit "A"............................................17

Notes Of Testimony Contradictory Statements...............18-32

Affidavits Of Sheila Booker And Darwin Jones..............33-34

Statement Of Verification...............................35

# TABLE OF CITATION

Pages

Brady v. Maryland, 373 U.S. 86, 83 S.Ct. 1194.....................14

Chapman v. Califorina, 386 U.S. 18, 87 S.Ct. 824.................11

Commonwealth v. Aaron, 255 Pa.Super. 289, 386 A.2d 1006..........10

Commonwealth v. Floyd, 327 Pa. 569, 476 A.2d 414.................6

Commonwealth v. Fowler, 352 A.2d 20.............................15

Commonwealth v. Jarecki, 609 A.2d 194...........................14

Commonwealth v. McGaghey, 510 Pa. 225, 507 A.2d 357.............14

Commonwealth v. McKelvie, 471 Pa. 541, 370 A.2d 1155...........13, 15

Commonwealth v. Patterson, 421 A.2d 1178........................15

Commonwealth v. White, 447 Pa. 331..............................5

Commonwealth v. Williams, 271 Pa.Super. 114, 412 A.2d 601........9

Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758...............6, 7

Foster v. Califorina, 394 U.S. 440, 89 S.Ct. 1127...............12

Gilbert v. Califorina, 388 U.S. 263, 87 S.Ct. 1951..............11

Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157..................6

Massiah v. United States, 337 U.S. 201, 84 S.Ct. 1199...........6

Michigan v. Defillippo, 443 U.S. 31, 99 S.Ct. 560...............10

Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375....................5, 14, 15

Pointer v. State Of Texas, 380 U.S. 400, 85 S.Ct. 1065..........8

Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55....................7, 12

Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967...................12

Thigpen v. Cory, 804 F.2d 893...................................15

united States v. Wade, 388 U.S. 218, 87 S.Ct. 1926..............5, 6, 7, 8,
                                                                11, 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRELL N. McKELVIE　　　　　　　:
　　　　　　PETITIONER

　　　V.　　　　　　　　　　　:　　DOCKET No.#

MARY LEFTRIDGE-BYRD
　　　　　　RESPONDENT　　　　:

BRIEF IN SUPPORT OF
WRIT OF HABEAS CORPUS UNDER 28 USC §2254

Mr. Darrell McKelvie, do hereby state the facts which are about to be brought before this Honorable Court are true and correct to the best of my knowledge:

On July 28, 1974 at approxmately 10:30pm, I was stopped by Officer Alton Smith and his partner Officer Bresnahan in the parking lot of the housing projects at 23rd and Norris Street. The officers asked us our names and we told them. Not knowing why, we were then handcuffed and turned over to the officers of the Juvenile Division.

Officer Stanley and his partnes Officer Payne, who works the Gang Control Unit, then transported us to St. Joseph Hospital for the purpose of identification. At the hospital, Winston Burney, who was allegedly shot in the buttock, **(Winston Burney was never treated at St. Joseph Hospital for a gun shot wound nor was any bullet found in Winston Burney on the date of this incident)** was asked by officer Stanley, were we the ones that did the shooting. His reply was, no. We were then taken to Temple Hospital to be identified by two other victims of this shooting. Once there we found out that one of the victims had died and the other person was still in surgery. We were then taken from the hospital to North Central Detectives to be questioned .

3

Next we were transported to the Police Administration Building. Once there we were then escorted tó the Homicide Division where we stopped in the homicide waiting room where the witnesses were located. At that time one of the witnesses yelled out, **"That's them",** to the detectives that they were talking to. The witness that yelled this out at this time, was amongst all of the other witnesses.

We were then taken out of the homicide waiting room and escorted to the interrogation room and interrogated by Lt. Grace who was now assigned to this case. After Lt. Grace investigation and without a formal line-up or the backing or seizure of any evidence, just the homicide waiting room confrontation, we were charged with Murder, Simple Assault, Aggravated Assault, Carrying a Firearm Withuot a License, Possessing of an Instrument of Crime and Criminal Conspiracy.

# IDENTIFICATION

The test of the validity of a **Pre-Wade,** test of validity of Confrontation-due-Process whether the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that defendant was denied Due-Process of law. When the confrontation of accused and accuser is uncontrived and ensuing identification does not result from any undue suggestion or other proscribed police practice there is no violation of due-process, **United States v. wade, 87 S.Ct. 1926;** see also **Commonwealth v. White, 447 pa. 331.**

Petitioner asserts that the on-the-scene identification procedure utilized by the police was unduly suggestive, unreliable and conducive to misidentification.  When an accused challenges an identification, it is the Commonwealth's burden to show that the procedures employed were not unduly suggestive, **Neil v. Biggers, 409 U.S. 199,  93 S.Ct. 375;** see also **United States v. Wade, 388 U.S. 235-237,  87 S.Ct. 1926 (Please see Author's Opinion 326 Id. at 236, 87 S.Ct. at 1937).**  Winston Burney stated at the hospital that the petitioner is not the one that he saw that shot him.  He also stated that he did not know the petitioner at which time petitioner was still in handcuff's, **(See Exhibit "A" Municipal N.T.").**

This violated petitioner's Constitutional Rights for identification challenges, such as line-ups and other identification procedures.  What was employed was unduly suggestive, thus the petitioner feels the burden of the Commonwealth in this instant case was to prove that there was no special elements of unfairness presented in the identification procedures.  Petitioner feels that since he was not identified on the street or at the hospital, that the police officers had no right to keep him handcuffed and or under investigation. **U.S.C.A. Const. Amend. 4, §951-952.**

5

A policeman may legally stop a person and question him, but
he may not without a warrant restrain that person from walking
away and putting handcuffs on him unless he has probable cause to
arrest that person.  Or that he observes such unusal and
suspicious conduct on the part of the person who is stopped, that
the police may reasonably conclude that a criminal activity may
be afoot, and that the person with whom he is dealing with maybe
armed and dangerous.

Petitioner also states that the policeman had no right to
arrest and put handcuff's on him.  The police had no information
of the physical make-up or characteristics of the men they were
seeking and did not know if the petitioner and his companion were
of the same description.  When petitioner was taken to the
hospital in handcuff's, where Winston Burney and Ricky Beard were
at the time, neither one of them identified the petitioner as the
one that perpetrated the act.  However, Winston Burney stated to
the police officers that petitioner was not the one, **(See Exhibit
"A" Municipal N.T.).**

**Law.**  A prior inconsistent statement is admissible only to
impeach the credibility of a witness and does not substantive
evidence, **Commonwealth v. Floyd, 327 Pa. 569, 476 A.2d 414.**  Also
applicability of the Sixth Amendment guarantee of the right to
counsel at pre-trial confrontations, **United States v. Wade, 388
U.S. at 226-227, 87 S.Ct. at 1931;** see also **Escobedo v. Illinois,
378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d. 977.**

We draw upon the rational of **Hamilton and Massiah** in holding
that the right to counsel was guaranteed at the point where the
accused prior to arraignment was subjected to secret
interrogation despite the fact accused did not know he was under
arrest when he was taken to the hospital, and the officers being
told at that time that petitioner was not the one that shot them,
see **Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199;** and
**Hamilton v. Alabama, 386 U.S. 52, 82 S.Ct. 157.**  We again noted

6

the necessity of counsel presence if the accuse was to have a fair opportunity to present a defense at the trial itself, **United States v. Wade, 388 U.S. 225-226, 87 S.Ct. 1931.**

Petitioner would like to point out that nothing decided or said in the opinions in **[Escobedo and Miranda]** links ibid. To the contrary the court said, those decisions simply reflected the constitutional principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out. Where counsel's absence might degate from the accused right to a fair trial. The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment, **Id. 226-227, 87 S.Ct. 1932.** This analysis led the court's formulation of the controlling principle for pre-trial confrontation.

In sum, the principle of **Powell v. Alabama,** and succeeding cases require that scrutinizing any pre-trial confrontation of the accused to determine whether the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself, **see Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55.**

It was that confrontation principle that the court applied in **Wade** to pre-trial confrontation for identification purposes. The court first met the government's contention that, a mere preparatory step in the gathering of the prosecution's evidence, much like the scientific examination of fingerprints and blood samples. In contrast the court also stated in **Wade,** ...the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucial derogate from a fair trial... **United States v. Wade, 388 U.S. at 228, 87 S.Ct. 1932.**

The court's analysis of pre-trial confrontation for identification purposes produced the following conclusion, insofar as the accused conviction may rest on a courtroom identification is in fact the fruit of a suspect pre-trial identification which the accused is helpless to subject to effective security at trial. The accused is deprived of the right to cross-examination which is an essential safeguard to his right to confront the witnesses against him, see **Pointer v. State Of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.** And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the hospital and at the Police Administration Building.

The trial which might determine the accused fate may well not be that in the courtroom but that at the pre-trial confrontation, which the State aligned against the accused, the witness, the sole jury and the accused unprotected against the over reaching intentional or unintentional and with little or no effective form of the judgement there rendered by the witness, **"That's The Man", United States v. Wade, 388 U.S. at 235-236, 87 S.Ct. 1926.**

An arrest subject to probable cause requirement is that defendant fit general description given by the victim. The Officer's patrolling the area of 23rd and Norris Street observed two males fitting the description crossing the parking lot of the housing projects at 23rd and Norris Streets. Both men were frisked and handcuffed and held there until the Juvenile Aid Officers arrived at the location in question. They then took both men to the hospital for on the "scene" identification. After Winston Burney, who was one of the victims of the shooting, who did not identify the petitioner as the perpetrator. From there the two defendants were taken to the North Central Detectives Police Station for questioning.

The right of law enforcement officials to conduct limited search and seizures under carefully defined circumstances without the need to establish probable cause is limited to on-street encounters.  Where the necessity for immediate action is observed and the danger to the person of the officer is imminent.

Questioning of the defendant pursuant to information received that he fit the general description given by victims could not be characterized as an investigatory detention, when he was not identified as the perpetrator.  Petitioner remained with the police because he was subjected to the will of the person's making the arrest.  Whereas he was told that he would be released by the police if he was not identified at the hospital as being the perpetrator by the victims.

The qusetion for the court is:

(1) Not just the pre-arrest, which after, not being identified at the hospital by the victims.  The petitioner should have been released, but this clearly violated petitioner's Fourth Amendment Rights.

(2) The question of the witness to view the petitioner at the time of the crime; the witness, the degree of attention, the accuracy of his description of the petitioner and the level of certainty at the hospital and at the Police Administration Building.

(3) We also feel the question is whether the challenged indentification at the Police Administration Building, has sufficient indication of reliability to warrant admission even though the confrontation procedure may have been suggestive.

(4) While the identification was not "on-the-scene", the length of time between the crime and the confrontation at the hospital was less then one hour.  There is no reason to assume that a hospital environment is inherently conducive to misidentification, **Commonwealth v. Williams, 271 Pa.Super. 114-118,**

412 A.2d 601 (1979).  See also **Commonwealth v. Aaron**, 255
Pa.Super. 289-298, 386 A2d 1006 at 1010 (1978).

(5) Petitioner suggests, the question of whether an officer
is authorized to make an arrest depends initially on whether
State Law authorizes such action.  **See Michigan v. Defillippo**,
**443 U.S. 31, 99 S.Ct. 560, 58 L.Ed.2d. 647.**  The appropriate
analysis is rather statutory authority for law enforcement
personnel to enforce laws and effect arrest in the Commonwealth
of Pennsylvania may be found in several statutes.  **See generally,**
**Gardner Arrest And Search Powers Of Special Police In**
**Pennsylvania:**  Do your Constitutional rights change depending on
the officers uniform?  **59 Temple Law Quarterly 497 (1986),**
**McCarthy Warrantless Arrest By Police Officers In Pennsylvania,**
**92 Dickerson Law Review 105 (Fall 1987).**  Borough police such as
those involved in the instant case receive their statutory
authority from  **52 P.S. §46121,** which provides in pertinent parts:

(i) Borough Policemen who shall be ex-offico constable of
the borough shall and may within the borough or upon property
owned by the borough for the violation of which a fine or penalty
is imposed, **Rule 70.**  Although no other Rule of Criminal Procedure
further augments or restrains police power to enforce the law in
summary offense cases.  The explanatory comment to **Rule 70,**
suggests other limitations.  "I", pertinent part the comment
provides; ... it is intended that those proceedings will be
instituted by arrest only in exceptional circumstances such as
those involving violance, or the involving a danger that the
defendant will flee..., **Pa.R.Crim.P., Rule 70, 42 Pa.C.S.A.**

Such was the evidence adduced at trial as to the pre-trial
identification.  It is the petitioner's position that the
identification was constitutionlly infirm because he was neither
informed of his right to have counsel present nor was he afforded
a formal line-up.  Petitioner argues accordingly that the
identification at the Police Administration Building should have
been excluded.  In support of this proposition, petitioner relies

upon the decision of the United States Supreme Court in **United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); also see Gilbert v. Califorina, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967);** as well as decisions in this Court and the Superior Court concurring the principals laid down by these cases.

In **Wade** and **Gilbert,** decided by the United States Supreme Court on the same day. The Court announced for the first time that; "A post-indictment [Pre-trial line-up] at which the accused is exhibited to identifying witnesses is a criminal stage of the criminal prosecution: The police conduct of such a line-up without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at the trial of the in-court identification of the accused by witnesses who attended the line-up". **United States v. Wade, 388 U.S. 237, 87 S.Ct. 1926;** also see **Gilbert v. California, 388 U.S. 272, 87 S.Ct. 1951.**

In **Gilbert v. California, Supra. 388 U.S. 272-274, 87 S.Ct. 1956,** it was further held that; "As part of the prosecution's case at trial, testimony is given by State witnesses that they identified the defendant at an uncounselled pre-trial line-up. Such testimony is subjected to a per se exclusionary rule. Requiring a [New Trial] unless the error can be declared constitutionally harmless under **Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)".**

Although the language of the majority opinion in **"Wade"** is broad enough to encompass all pretrial identification confrontations. What has been said is not to suggest that there may not be occasions during the course of a criminal investigation when the police do abuse identification procedures. Such abuses are not beyound the reach of the constitution. As the court pointed out in **"Wade"** itself, ...it's is always necessary to scrutinize any pre-trial confrontations... **388 U.S. at 227, 87 S.Ct. 1926.**

11

The due process clause of the Fifth and Fourteenth
Amendments forbids a line-up that is unnecessary suggestive and
conducive to irreparable mistaken identification, **Stovall v.
Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d. 1199;** also see
**Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402.**
When a person has not been formally charged with a criminal
offense, Stovall strikes the appropriate constitutional balance
between the right of a suspect to be protected from prejudicial
procedures and purposeful investigation of an unsolved crime.

The principle that in addition to counsel's presence at
trial, the accused is guaranteed that he need not stand alone
against the State at any stage of the prosecution, formal, in
court or out. Where counsel's absence might derogate from the
accused rights to a fair trial. The security of that right is
as much the aim of the other guarantees of the Sixth Amendment,
**United States v. Wade, 388 U.S. at 226-227, 87 S.Ct. at 1932.**

In sum, the principle of **Powell v. Alabama,** and succeeding
cases requires, the court to scrutinize any pre-trial
confrontations of the accused to determine whether the presence
of counsel is a basic right to a fair trial as affected by his
right meaningfully to cross-examine the witnesses against him
and to have effective assistance of counsel at the trial itself.
It is called upon the court to analyze whether potential
substantial prejudice to defendant's right inheres in the
particular confrontation and the ability of confrontation and
the ability of counsel to help avoid that prejudice, **Id., at
227, 87 S.Ct. at 1932.**

It was the constitutional principle that the court appointed
in **Wade,** to pre-trial confrontation for identification purposes.
The court first met the government's contention that a
confrontation for identification is, "A mere preparatory step in
the gathering of the prosecution's evidence". However the court
must take into consideration that, suggestiveness alone will not

forbid use of identification.  If reliability of subsequent
identification at the Police Administration Building resulted
from the criminal act, and not from the suggestive encounter at
the hospital.  For the identification to be admissable, the
police station identification was not a result of criminal
incident but suggestive confrontation at the hospital.

The court must remember that witnesses viewed perpetrator
at the scene at night in very poor lighting at approximately
twenty feet or more, and viewed the perpetrator for no more than
two seconds as the shots were being fired at them.  All of the
witnesses were running with their backs to the sound of the
shooting as it contiuned.  All of the witnesses indicated while
the block did have some lighting which was poor, however the
incident did not occur directly under any light.

Also the court must realize that if one reads the trial
transcripts that there is contradictories made in the statements
of all the witnesses, both in and out of court.  One such
contradictory is the identification of the perpetrator.  The
second is the description which was not consistent with the
petitioner had on at the time of his arrest.  The third thing
being the location or the distance of the shooter at the time
the shots were being fired.

The only evidence that the prosecution had against
petitioner was this identification which the witnesses are now
recanting their statements and testimonies, **(Please See
Affidavits By Darwin Jones And Sheila Booker)**.  Although the
court stated that the waiting room confrontation was accidental
when Darwin Jones who is now recanting his statement and
testimony, stood up and yelled in the homcide waiting room,
**"That's Him"**, forever tainted the identification process, see
**Commonwealth v. McKelvie, 471 Pa. 541, 370 A.2d 1155.**  If any of
the witnesses weren't sure who the shooter was before this
confrontation, was now coerced because of this confrontation

13

into believing that petitioner was the shooter.  This
confrontation was consider a line-up and was all that convicted
petitioner and should be considered an illegal line-up.

Since there was no counsel present during this suggestive
confrontation, this not only violated petitioners to Due Process,
it also violated petitioner rights to have a fair trial.  In
**Neil v. Biggers,** the United States Supreme Court stated,
...suggestive confrontations are disapproved because they
increase the likelihood of misidentification... **Neil v. Biggers,**
409 U.S. at 198, 93 S.Ct. 375.

Prosecutors and detectives abused there authority by
questioning the witnesses without the permission of their parents
or legal guardian.  The youngest witness was 12 years of age and
the oldest was 15 years of age.  These children were taken to
the police station immediately after the shooting, late at night,
questioned without their parents or legal guardian consent,
afraid and coerced into what to say.  This information was
withheld from the jury.  This action could be considered
prosecutional misconduct under Brady, see **Brady v. Maryland,**
373 U.S. 86, 83 S.Ct. 1194.

Since this is what happened there is at lease arguable
merit in petitioner's contention that all of the witnesses
identification of petitioner at the Police Administration
Building was the product of police suggestion.  The court stated
in **Commonwealth v. McGaghey,** ...The problem an impermissible
suggestive identification is the potential for misidentification
resulting in a due process violation if the identification is
admitted at trial..., **Commonwealth v. McGaghey,** 510 Pa. at 225-
228, 507 A.2d 357.  The court also stated in **Commonwealth v.
Fowler,** ...the testimony of a witness who will point an accusing
finger at the defendant during the trial, should be prohibited
unless the prosecution establishes by clear and convincing
evidence at a suppression hearing, that the witness's proposed

trial identification will be reliably based on the witness's observation at the time of the crime. And that the identification was not induced by events occurring between the witness's observation at the time of the crime and the witness's in-court identification..., **Commonwealth v. Fowler, 352 A.2d at 20.**

Despite a suggestive identification procedure, an in-court identification will not be suppressed if the Commonwealth has showed by clear and convincing evidence that there exists an independent basis for the in-court identification, **Id. at 20, 352 A.2d 17.** Hence this requires a consideration of:

(a) The circumstances under which the witnesses viewed the actual crime;

(b) The witnesses degree of attention;

(c) The accuracy of the description prior to the suggestive identification;

(d) The level of certainty in identifying the perpetrator;

(e) The laps of time between the crime.

See **Commonwealth v. Jarecki, 609 A.2d 194 at 199; Thigpen v. Cory, 804 F.2d at 896;** also see **Neil v. Biggers, 409 U.S. at 199, 93 S.Ct. 382.**

Finally, trial court did abuse it's discretion in denying defendant's counsel a continuance that would have enable him to obtain the transcripts of the suppression hearing testimony for use in cross-examining witnesses at trial, see **Commonwealth v. McKelvie, 471 Pa. 541, 370 A.2d 1155.** If trial counsel would have been allowed to review suppression transcripts, the contradictory testimony and statements would of shown the jury at trial that the witnesses were coerced in giving their testimony. This request was petitioner's first and only request for a continuance during the trial. By not allowing this continuance, violated petitioner's rights to Due Process and his rights to a fair trial. In **Commonwealth v. Patterson,** the court stated, ...denial of defendant's request for continuance of criminal prosecution was a clear abuse of discretion where request was defendant's first request for continuance... **Commonwealth v. Patterson, 421 A.2d 1178.**

Also in support of this petition, petitioner now submits two (2) affidavits from the witnesses, **Darwin Jones and Sheila Booker,** which petitioner trust that this court will look into as **"Newly Discovered Evidence".**

We honorably submit this brief in the hope that we have shown that the identification factors in this case were duly suggestive and highly inflammatory to petitioner. We also trust that this Honorable Court will look at all of the additional evidence and the Newly Discovered Evidence that have been presented in this brief and grant this petitioner a new trial which would stop this miscarriage of justice from continuing.

Respectfully submitted,

*Darrell McKelvie*

Darrell McKelvie
Pro se Petitioner
AF-5156
500 E. 4th Street
Chester, Pa. 19013

Dated: July 3, 2000

16

7

BURNEY- DIRECT- CROSS

A        I seen when he got up, he started to run and then he fell.

Q        Who?

A        Pinto.

        MR. CAPONE:  I have no further questions.

BY MR. KIDD:

Q        Did you know the Defendant prior to the time he allegedly shot you?

A        No.

Q        When was the first time you saw the Defendant?

A        At --

Q        After he allegedly shot you?

A        At the hospital.

Q        Saint Joseph's Hospital?

A        Yes.

Q        Is it not true at that time you denied knowing this particular person,and also stating he did not shoot you?

A        Yes, that's true.

Q        When,then, did you decide he did shoot you?

A        Down at the Roundhouse.  My mother said to go in there and tell them that you know what happened

Case 2:23-cv-24873-DLC Document 104 Filed 05/09/21 Date Filed 07/13/2021 Page 116 of 151

Pre-Trial, NT. p.21, 1/15/75,  Ricky Beard-Cross

Q. How many shots did he fire?

A. About six or five.

Q. Approximately how far was he from you?  ( See p.22)

A. About five or six feet.

Q. And, how was he holding the gun?

A. Had it like with two hands.

Q. After you saw the flash and heard the shot, what did you do?

A. I ran.

(See NT. p.31, Beard-Cross)

Q. When did you first see the person who fired the shots?

A. When I turned around ,when he shot one time I saw him.

Q. Did you see him walking down the street?

A. No.

Q. After the shot was fired, what did you do?  (See NT. p.32)

A. I turned around.

Q. Was the street dark?

A. A little light was coming in down the street.  (See NT. p.33)

Q. So it was dark at 2311 North Van pelt?

A. It was not too dark that you can't see nobody.

(See NT. p.48, Beard-Re-Direct)

Q. That is a picture of Van Pelt?

A. Yes.

Q. It shows some more of the street?

A. Yes.

Q. Does that accurately reflect Van Pelt Street on the night of the
   incident?

A. Yes.

Q. Was that light--you see the light there--indicating there--the
   street light? Was that there on the night of the incident?

A. No.

Q. Was that on?

A. No, the bar light.

18

(See NT. p. 49, Beard-ReDirect)

Q. Which bar light?

A. The bar at the corner.

Q. Not this one, this one over here, did you notice if this light was on (Indicating)?

A. I said the bar light was on.

Q. I direct your attention to this street light, which is right down from 2311 Van Pelt Street. Do you see that light?

A. Yes

(See NT. p.50)

Q. Now, on the night of the shooting did you notice whether or not that light was on?

A. No.

Q. By "no" what do you mean?

A. I didn't notice if it was out or on.

Beard-ReCross

Q. Rickey, you said the bar sign was lit?

A. No, it is on the wall, they have a light on the wall.

Q. Is this the light you say you don't know was on or off that night (Indicating)?

A. Yeah.

(See NT. p.34, Beard-Cross)

Q. Well, when did you see the person who fired the shot before he fired the shot?

A. When I turned around and looked I heard one shot and I looked at him and ran.

Q. Did you see anyone get hit with the first shot that was fired?

A. No.

(See NT. p.35)

Q. You did not see the second shot fired?

A. No.

Q. Were the shots fired in rapid seccession; were they fired such as--bang,bang?

A. "Bang,bang,bang."

19

(See NT. p.44)

Q. The first shot was fired and you turned around and in the time before the second shot you turned around again and started to run?

A. Yes.

(See NT. p.45)

Q. And it was only during that period between the first and second shot that you had an opportunity to see who was firing the gun?

A. When the first shot-- I recognized who it was.

Q. And than you turned around again and started running again before the second shot?

A. Not before the second shot, I ran and before I got to the middle of the block I heard the second shot.

Q. You are now saying the shot was fired and you ran from 2311 Van Pelt to the middle of Van Pelt before you heard the second shot fired?

A. I say the second shot was fired before I got in the middle of the block.

Pre-Trial, NT. p. 21,1/15/75, Beard-Direct

The Court(To the witness): Repeat what you just said and more
Clearly.
The Witness:  I seen Mutt and he was shooting and I seen the
sparks come out of the gun, and he had a flowered shirt on.

(See NT. p.23)

Q. Describe how you saw him at the Police Administration Building?

A. He had on a White T-shirt and he had his hat on, black hat.

Trial, NT. p.144, 1/24/75, Beard-Direct

Q. How was the Defendant dressed?

A. He had a brown flowered shirt on.

(See NT. p.148) -Cross

Q. Now, when you turned around and looked at this person shooting,
after the first shot was he wearing a dark or a black jacket over
his flowered shirt?

A. He didn't have no jacket on.

Q. You are absolutely certain he didn't have no jacket on?

A. Yes.

Q. Why, was the flowered shirt hanging out and very identifable?

A. The pants.

Q. Hanging outside his pants?

A. Yes.

Q. What color was the pants he was wearing?
A. I don't know.

Q. Was he wearing a cap?

A. A black cool cap.

Q. What was the Defendant wearing when he arrived at the Police
Station?

A. A White T-shirt on, and I forget the color pants he had on.

(See NT. p.149)

Q. Did he have a jacket over his shoulder or anything?

A. I think. I don't remember.

Q. What was Earp wearing?

A. I forgot what Earp was wearing.

(continue from NT. p.149)

Q. At the time of the shooting, what did Earp have on?

A. A white T-shirt on , I don't know what color pants it was.

Q. You are sure at the time of the shooting he had a white T-shirt on and did not have a jacket on?

A. Yes.

### Trial, NT. p.142, Beard-Direct

Q. How long have you known him?

A. About three or two years.

Q. How long do you know Leslie Earp?

A. About two, three years.

Q. How was he shooting?

A. He had the gun in both his hands.

### (See NT. p.143)

Q. Then what happened?

A. I looked at him, and he had a shirt on, and he ran and shot Sheila and killed Angelo.

### (See NT. p.145) - Cross

Q. Ricky, exactly when did you start to run?

A. After the first shot, I turned around and looked and ran.

Q. Am I right in stating that you were looking down toward York Street. or towards the childen on the step?

A. The childen on the step.

Q. So you were not looking up to where the person shooting came from?

A. Not until the first shot.

### (See NT. p.146)

Q. Am I right in stating that you started to run before the second shot was fired?

A. No.

Q. You didn't start to run--when did you start to run?

A. When the first shot.

(continue from NT. p.146)

Q. So you only looked at the Defendant momentarily, you turned around and looked and started to run; is that what you did?

A. I looked--I looked, but don't know how long.

Q. But it was a very, very short time that you looked at him?

A. I would not know.

(See NT. p.147)

Q. Are you a member of the Norris Nation Gang?

A. No.

Q. Were you are shot before?

A. Yes.

Q. Were you shot in a gang fight?

A. No.

Q. Were you shot by someone who was a member of the 25th and Diamond Street Gang?

A. Yes.

(See NT. p.151)

Q. When you look at the person doing the shooting, did you see that he was shooting with a pistol?

A. He had it with two hands, the pistol.

Q. Is it natural for me to say that you actually were looking at the pistol rather than looking at the person doing the shooting?

A. A little bit, yes.

Q. You looked at them both?

A. Yes.

Q. You also just testified that you saw Angelo killed by the person doing the shooting, and also that you saw them shoot Shiela, that is not correct; is it? You could have only seem--if you saw one bullet fired--

A. I didn't see anybody shot.

(See NT. p.152)

Q. And as you were running down the street, were you running quickly?

A. Yes.

Q. And you never turned around when you were running down the street, you were just running?

A.

(continue from NT. p.152)

The Witness: Huh?
Mr. Kidd:  You were just running, you didn't turn around and
           look at the people shooting at you, did you?

A. No.

Q. You remember testifying in a case in Room 676 in City Hall, do you
   remember testifying  in a case where Leslie Earp was on trial?

A. Yes.   (answer on page 153)

(See NT. p.155)

" Question:  Did you see him get shot?

"Answer:    Yes.

"Question:  Do you see in court today the man who shot him?

"Answer:    Yes.

"Question:  Point him out for the judge.

"Answer:    (Indicating)

The Court: Is the man who did the shooting in the
           courtroom today?

The Witnee:  Yes.

(See NT. p.156)

Q. At that time was this Defendant in the courtroom?

A. No.

Q. Now, are you saying that your statements that you gave under oath
   that day were incorrect?

A. (No Response)

The Court(To the Witness): Answer the question.

A. Yes.

(See NT. p.167) Re-Direct

Q. Did you mean to tell the Court before that you saw Leslie Earp
   shoot ?

A. No.

(See NT. p.168) Re-Cross

Q. You just testify that you didn't mean to say that Leslie Earp
   was the one who did the shooting.  You mean you did not want to
   testify to that statement at that last hearing?

A. I didn't.

24

(continue from NT. p.168)

Q. Did you testify that it was him that did the shooting?
A. I said he was on the corner.

(See NT. p.169)

Q. You testified in that proceeding that Leslie Earp shot Robert Henry Davis , and then the District Attorney stopped questioning you, is that right?
A. Yes.

### Pre-Trial, NT. p.23, 1/15/75, Beard-Direct

Q. Did you go down to the Police Administration Building?
A. Yes.
Q. And did you see the Defendant?
A. Yes.
Q. What were you doing at the Police Administration Building?
A. They were asking me questions, the detectives.
Q. And what happened as he was asking the questions?
A. He asked me if I knew him.
Q. Knew who?
A. Mutt.
Q. And where was he--
A. He was standing up handcuffed.
Q. How far was he standing from you?

(See NT. p.24)

The Witness:  What?

Mr. Carpenter: (To the Witness): How far was they standing--
A. Mutt was about six or five feet away from me.

(See NT. p.36) - Cross

Q. You were at St. Joseph's Hospital when Winston Burney was being treated ?
A. Yes.
Q. Did you see the Defendant Mutt brought into the hospital handcuffed between two police officers?
A. Yes.

(See NT. p.37)

Q. But you did volunteer to them or say to the policeman that those two persons in handcuffs were the persons that committed the shooting?

A. No.

(See NT. p.39)

Q. About how long did you wait before McKelvie and the other boy came into the area, into the room?

A. I don't know, about an hour.

(See NT. p.39)

Q. How long were they in the homicide room?

A. I don't know, about ten or five minutes, maybe more.

Q. Did you then go into another room and look through a one way mirror and make an identification of anyone.

A. No.

(See NT. p.46)- Re-Direct

Q. Now, you say you know Mutt from the playground and the school?

A. By the projects.

Q. What did you do with Mutt?

A. Me and my friends go up to the school around there and he would come over and play.

Q. How many times did you play basketball with him?

A. I don't know, a couple of times or--

Q. Lots of times?

A. Yes.

## Trial, NT. p.150, 1/24/75, Beard-Cross

Q. Did you see any policemen come in at St. Joseph's Hospital?

A. Yes.

Q. You did know that the police were at the hospital were regard to the shooting don't you?

A. Yes.        (answer on page 151)

26

Case 2:23-cv-04837-DS Document 10-1 Page Filed 07/09/21 Date Filed 07/15/2021

M. C. #74-07-3250, NT. p.19, 10/2/74
Kevin Creamer - Cross

Q. This boy Mutten, did you see Mutten fire the gun?

A. Yes.

Q. Did you watch him fire all six shots?

A. He fired all six shots.

Q. So then you watched him for the whole time the shooting occurred?

A. Yes. Not the whole time, but when the shooting stopped, I looked up and saw Mutten running and Crazy Earp ran up and grabbed the gun.

Pre-Trial, NT. P.46, 1/16/75, Creamer - Cross

Q. And what happened?

A. Mutt and Crazy Earp came around the corner and we saw them, but we ain't pay no attention to them, and Mutt--he started shooting.

(See NT. p.52)

Q. Am I correct in saying that you didn't see the person shooting until after the shots were fired?

A. No. I said I didn't see him when he stopped firing I looked up.

Q. When he started?

A. No, after he stopped.

(See NT. p.53)

Q. He stopped firing you looked up?

A. Yes, and he passed the gun to Crazy Earp.

Trial, NT. p.93, 1/24/75, Creamer - Cross

Q. How do you know it was the Defendant who had the gun right after the shots were fired?

A. Well, four shots and I looked up and saw him.

(See NT. p.96)

Q. Were you able to see his face during the first four shots?

A. No.

27

(See NT. p.119-Creamer)

Q. All right when the shooting first occurred, when you heard the first shot, what did you do?

A. I ran and hid.

M.C. #74-07-3250, Nt.p.19, 10/2/74

Creamer-Cross

Q. Did you tell the police when they arrived that it was Mutten who did the shooting?

A. I said Mutten and Crazy Earp.

Pre-Trial, NT. p.57, 1/16/75, Creamer

Q. Did he ask you if you saw the shooting?

A. Yes.

Q. Did you tell him if you knew who did the shooting?

A. Yes.

Q. What did you tell him?

A. I told him Crazy Earp and Little Man.

(See NT. p.49,Creamer)

Q. Had you known the Defendant before?

A. I heard people call him Mutt in the school yard.

Q. Do you know him by any other name?

A. No.

(See NT. p.52, Creamer)

Q. When you talked to the police at the Roundhouse, what did you think the Defendant's name was?

A. I thought it was Little Man.

(See NT. P.59,Creamer)

Q. When you used to go over to the basketball yard is that where you saw Little Man?

A. Not Little Man, I had gotten Little Man and Mutt mixed up. It was Mutt I saw in the school yard.

Q. But Little Man was over the school yard?

A. I never saw Little Man, I know him when I see him.

(continue from NT. p.59)

Q. When you were going over to the school yard did you know the Defendant was Mutt?

A. Yes.

Q. When you were going over to the school yard to play basketball you knew Little Man was Little Man?

A. Yes.

### Trial , NT. p.100, 1/24/75, Creamer-cross

Q. Do you know another member of that gang by the name of Little Man?

A. No, I had thought Mutten had two names-Little Man and Muttley.

### (See NT.p119)

Q. Is it possible that there is another man by the name of Little Man that you may have known?

A. I don't-- I know a Little man, be he ain't from the Valley, though.

Q. You know a Little Man not from the Valley Gang?

A. Yes.

Pre-Trial, NT. p.48, 1/16/75, Creamer-Direct

Q. Do you recall how the Defendant was dressed at this time?
   The Witness:  When he was shooting?
   Mr. Carpenter:  Yeah.
A. He had a flowered shirt on.

(See NT. p.50)

Q. And what did you do after you saw him?

A. I came back from the water fountain and I told the detective that they was the two boys-Mutt and Crazy Earp.

Q. How was Mutt dressed?

A. He had a white T-shirt.

Trial, NT. p.95, 1/24/75, Creamer-Direct

Q. And how did you describe him?

A. He-- I said Little Man had on a flowered shirt, dark pants, and jacket, and a black cool cap, and Crazy Earp had on a dark jacket, dark pants, and white T-shite and white cool cap.

(See Creamer statement he gave to police at Roundhouse)

(See NT, p. 107-09)

Q. Can you give me a good description of Little Man and Crazy Earp and tell me what they were wearing?

A. Little Man is a thin boy, taller than me. He was wearing blue or black pants--"

   Mr. Kidd: Sorry.

   "-- blue or black pants , dark-colored pants, and an orange shirt with flowers, and he was wearing sneakers, and he had on a black cool cap.

Q. Describe Crazy earp?

A. I really can't give you a good description of Crazy Earp be-cause when he stated to fire, I ducked my head. I saw his face when he got done firing. Him and Little man turned together and stated to run.
   "Crazy Earp had a black cool cap, and he's medium built. he had a blue jacket on, because I saw it when he stated to run. I don't remember anything else about them."

30

(See NT. p.124)

Q. Do you also remember that when you saw Mutt on the night of the shooting-- when you saw Mutt at the Police Roundhouse of the night of the shooting, was he handcuffed when he first came in?

A. Yes.

Q. Was he standing with Earp ?

A. Yes, Crazy Earp was standing in back of him.

Q. At this time weren't you getting a drink of water?

A. I was going to get a drink of water. (continue from p.125)

Q. Did you notice any differences in the way he was dressed at that time?

A. Yes.

Q. What were those differences?

A. He didn't have his orange flowered shirt on, had a white T-shirt on.

Q. When you first testified today you described the Defendant as wearing a flowered shirt and a black jacket.

    The Witness:    During the shooting?
    Mr. Kidd:     During the shooting.

A. I said--

Q. You testified that the boy who did the shooting was wearing a black jacket.

A. Dark.

Q. And a flowered shirt?

A. Yes.

Q. So that there was other differences when he arrived at the police station, he didn't have on a dark jacket?

A. Yes, he had on the dark jacket, but he didn't have the shirt on.

Q. He had the dark jacket on top of the polo shirt, or the white T-shirt?

A. Yes.    (continue from p. 126)

Q. Was he wearing or carrying it?

A. Had it on the shoulder.

Q. Would you explain that again to me. I don't follow your answer.

A. He was handcuffed and the jacket was on his shoulder.

Q. Was he still wearing a black cap.

A. No.

(continue from p. 126)

Q. Was he wearing a black cap when he came in?

A. Yes, he was wearing a black cap when he came in.

Q. Was he wearing a black cap when the shooting occurred?

A. Yes.

Q. And you are absolutely certain the Defendant did not have on a pair of beige pants, a color that would be slightly darker than this folder(indicating)?

A. Postive.

(See NT. p.128)

Q. When the Defendant allegedly did the shooting, did he have that black or dark jacket on?

A. He had a dark jacket on.

Q. Was it buttoned or hanging loose?

A. It was zippered.

Q. And was it a long sleeve jacket that he had on?

A. Yes.

(continue to p.129)

Q. And when you looked at him you could see the flowered shirt underneath the jacket?

A. It was not zipped all the way up.

Q. Am I right in saying the zipper would have come up like this and there might have been a little opening?

A. No, right up to the second button.

Q. And you saw the flowered shirt underneath the dark jacket?

A. Underneath it, no, was not zipped all the way up.

Q. The flowered shirt was not sticking out on the sides or any-thing, was it?

A. No.

### AFFIDAVIT OF SHEILA M. BOOKER

1. On JULY 28, 1974 at 10:30 pm I was present at the 2300 Block of Van Pelt Street sitting on the steps of 2313 with a few friends when I looked across from where I was sitting, I noticed this very very dark-skinned black teenager wearing a white T-shirt, and dark blue jeans.

2. Glancing down from where I was at no more than a few seconds shots were being fired and we all stated running immediately.

3. I saw for an instant as I stating running the dark-skinned boy stated shooting a handgun, but it was not Darrell McKelvie.

4. This is what I told the police, the detectives, and the district attorne who apparently did not want to hear that, they were only uring us to sa that the boys they had arrested were the ones who did the shooting.

5. Seeing the person they claimed did the shooting at the trial, I told the police, the detective, and the district attorney that I did not see neither one of the two boys doing the night of the shooting, they simply were not there. I did not see Darrell McKelvie that night.

I sworn to the above statement on this day of October 20, 1995 that the statements are true.

Sheila M. Booker

_Sheila M. Booker_

sworn to and subscribed before me
this ___ day of _FEB_ 19___

NOTARIAL SEAL
WILLIAM E YOUNG JR. Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 17, 1998

33

### AFFIDAIT OF DARWEN JONES

I, **Darwen Jones,** after being duly sworn according to law deposes and says that the facts setforth herein are true and correct to the best of my knowledge, information and belief;

1) That in 1975 when I was a juvenile, at the age of 14-years and and couple of months I was compelled to testify against **Darell McKelvie** while being constantly taken from juvenile custody to city hall, in the City of Philadelphia.

2) That I was paid through checks from the District Attorney's and the Philadelphia Police to give testimony against **Darell McKelvie.**

3) I, further know of my of personal knowledge that it definitely was not Darell McKelvie in the case that I testified in, that I said it was him because I was doing what I was told to do, and over all of these years it has pained me to know that I caused this man to suffer such a great injustice, that I never inmagined would cause such pain and anguish for this man.

4) I, further know of my own personal knowledge that the others who testified against **Darell McKelvie** know that it was not him that we should have b identifying; IT DEFINITELY WAS NOT HIM.

5) Further, I was threatened by the Philadelphia Police and Detectives, and other authorities from the District Attorney's Office that if I didn't testify against this man action would be taken against me.

6) Further, I was constantly being groomed to testify, and what to say, and how to say it; and told don't say this like that, say this this way.

7) I am willing to give this testimony to correct this matter before the Court in City Hall if necessary to correct the injustice I helped to bring upon this man.

_Darwen Jones_
Darwen Jones

SWORN TO THIS 80th DAY OF JUNE, 1995

BEFORE THE NOTARY PUBLIC

Notarial Seal
Elizabeth Jane Kovich, Notary Public

## VERIFICATION

I, the undersigned, verify that the above statements are true and correct and that any false statements herein are made subject to 18 **Pa.C.S.A. §4904** relating to unsworn falsification to authorities.

Respectfully submitted,

*Darrell McKelvie*
Darrell N. McKelvie
Pro se Petitioner
AF-5156
500 E. 4th Street
Chester, Pa. 19013

Dated: July 3, 2000

35

# Attachment C:

# Orders and Opinions Denying Prior 28 U.S.C. § 2254 petitions

# Note: This attachment does not include the order denying Petitioner's 1985 petition for writ of habeas corpus as undersigned counsel was unable to obtain a copy.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRELL N. MCKELVIE                    :          CIVIL ACTION

    v.

MARY LEFTRIDGE-BYRD, <u>et al.</u>       :          NO. 00-3409

FILED

31 2001

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

**ORDER**

AND NOW, TO WIT, this _21_ day of January, 2001, it
appearing that petitioner has filed the above-captioned petition
for habeas corpus pursuant to 28 U.S.C. § 2254, and

it further appearing that petitioner has filed a previous
petition pursuant to 28 U.S.C. § 2254, 85-2083, which was decided
on the merits, and

it further appearing that on April 24, 1996, the
Antiterrorism and Effective Death Penalty Act of 1996, Pub. L.
No. 104-132, 110 Stat. 1214, became law, which provides in
relevant part that federal courts must dismiss claims in a second
or successive petition that were presented in a prior petition,
and that federal courts must dismiss claims in a second or
successive petition that were not presented in a prior petition
unless:

(1) the claim relies on a new rule of constitutional law,
made retroactive to cases on collateral review by the Supreme
Court, that was previously unavailable; or

(2) the factual predicate for the claim could not have been
discovered previously through the exercise of due diligence, and
the facts underlying the claim, if proven and viewed in light of
the evidence as a whole, would be sufficient to establish by
clear and convincing evidence that, but for constitutional error,



no reasonable factfinder would have found the petitioner guilty, and

it further appearing that before such a second or successive petition may be filed in the district court, however, the petitioner must obtain an Order from the Court of Appeals authorizing the district court to consider the petition, and that the Court of Appeals may issue the Order only if it determines that the petition makes a prima facie showing that it satisfies either (1) or (2) above, it is hereby

ORDERED that the Report and Recommendation of United States Magistrate Judge Arnold C. Rapoport is APPROVED and ADOPTED.

IT IS FURTHER ORDERED that this case is DISMISSED WITHOUT PREJUDICE to petitioner's right to seek an Order from the United States Court of Appeals for the Third Circuit authorizing this court to consider these claims.

LOUIS C. BECHTLE, J.

2

# Attachment D:

# Magistrate Judges' Reports and Recommendations in Prior 28 U.S.C. § 2254 petitions

**D-1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL M. McKELVIE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ROBERT FREEMAN and THE ATTORNEY | : | |
| GENERAL OF PENNSYLVANIA and | : | |
| THE DISTRICT ATTORNEY OF | : | |
| PHILADELPHIA COUNTY | : | NO. 85-2083 |

## REPORT AND RECOMMENDATION

PETER B. SCUDERI                           October  7th , 1985
UNITED STATES MAGISTRATE

     This is a <u>pro</u> <u>se</u> petition for a writ of habeas corpus filed[1] by an individual presently confined in the State Correctional Institution at Camp Hill, Pennsylvania.  For the reasons that follow, I recommend that the petition be denied.

------------------------------

[1]    This petition was originally filed in the United States District Court for the Middle District of Pennsylvania on March 6, 1985.  By memorandum and order dated April 3, 1985, the petition was transferred to the United States District Court for the Eastern District of Pennsylvania.

DarrellMcKelvieDAOFiles131

## FACTS AND PROCEDURAL HISTORY:

Following a jury trial before the Honorable Eugene Gelfand of the Philadelphia Court of Common Pleas, the petitioner was found guilty of first degree murder, conspiracy and two counts of aggravated assault (October Term, 1974, Nos. 987-992). On direct appeal, the Supreme Court of Pennsylvania affirmed the murder conviction. <u>Commonwealth v. McKelvie</u>, 471 Pa. 541, 370 A.2d 1155 (1977).

Petitioner next sought relief under the Post Conviction Hearing Act ("PCHA"). The Honorable Edward J. Blake of the Philadelphia Court of Common Pleas denied relief on December 6, 1979. The Supreme Court of Pennsylvania affirmed Judge Blake's order <u>per curiam</u> on March 11, 1983. <u>Commonwealth v. McKelvie</u>, 500 Pa. 336, 456 A.2d 984 (1983).

In his instant habeas corpus petition, the petitioner claims that he was denied the effective assistance of counsel at trial in that trial counsel failed to object to the improper and prejudicial remarks of the prosecutor during summation.

-2-

DarrellMcKelvieDAOFiles132

DISCUSSION:

The exhaustion requirement of 28 U.S.C. § 2254(b) and (c) which is based on the policy of federal/state comity requires this court to determine if petitioner has exhausted his state remedies before he may reach the merits of the case. An applicant for writ of habeas corpus must exhaust all state remedies unless none are available at the time the federal petition is filed or the facts of the case would make pursuit of the available remedies useless. The exhaustion requirement promotes the principle of federal/state comity "by allowing the state an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." Duckworth v. Serrano, 454 U.S. 1, 3 (1981).

Petitioner, in this case, has raised the substance of his ineffective assistance of counsel claim in the state court and has exhausted all available state remedies. Therefore, his case must be considered on its merits.

To prove ineffective assistance of counsel, a defendant must show first, that counsel's performance was deficient, and second, the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Strickland v. Washington, 104 S.Ct. 2052 (1984). Petitioner argues that trial

-3-

DarrellMcKelvieDAOFiles133

counsel was ineffective for failing to object to comments made by the assistant district attorney during summation to the jury. The petitioner alleges that the following portions of the prosecutor's summation were objectionable:

> First of all, the issue in this case is not what the defendant's name is. The issue in this case is, did the defendant shoot and kill Angelo Davis. It does not matter if his name is George, or Little Man, or Mutt. That is not the point -- or Darrell. The only quesion (sic) is -- is this the man, not his name. And you have had a lot of sand kicked in your eyes over this matter of the names, and I will mention it because I feel I must mention it in due course.

(N.T. 413).

. . .

> Well, you may say, that maybe it was the other Little Man, maybe some of them got confused. Well, it is up to you to decide if the two look alike. I don't know.

> The defendant -- consider it from Little Man Hall's point of view. Under the defense theory, as I understand it, it was either this defendant or it was Little Man Hall -- the other guy who was brought in -- from his point of view. If, indeed, he is the killer, is he going to come into this courtroom, and is he going to come in dressed in a flowered shirt? Think of that for a moment, if it was that Little Man. If that was you, would you dress up in the flowered shirt and come to court knowing that the killer was supposed to have worn a flowered shirt and called by your nickname? This is an attempt -- an attempt by gang members in Philadelphia to

-4-

DarrellMcKelvieDAOFiles134

> simply subvert the justice system of this
> country. That's all that it is.  It is
> their little game.  It is a game they are
> playing.

(N.T. 414-415).

. . .

> I think you will find that it is appalling
> that such a thing like this can go on in
> our community.  None of us, I'm certain,
> would approve of this violence among our
> young people.  We know this is not an
> isolated case, and we know that violence
> breeds violence.  They feel that if you
> hit me I'll hit you -- retaliation.  But
> members of the jury, retaliation does not
> come from them -- but comes from the
> system which you are -- you are the
> system.  You represent the system of
> justice.

(N.T. 423).

The Supreme Court has held that in order to amount to a
denial of due process, comments of the prosecutor must amount to
egregious misconduct, which is so prejudicial as to make a trial
fundamentally unfair.  Donnelly v. DeChristoforo, 416 U.S. 637
(1974).  In cases where petitioner seeks to mount a fourteenth
amendment due process attack, he must show that he has been
denied, "that fundamental fairness essential to the very concept
of justice."  Lisenba v. California, 314 U.S. 219, 236 (1941).

-5-

DarrellMcKelvieDAOFiles135

In addition, the court must examine the prosecutor's comments with respect to the entire proceeding. <u>Easter v. Estelle</u>, 609 F.2d 756, 760 (5th Cir. 1980). Within broad limits, counsel for both sides are entitled to argue the inferences they wish the jury to draw from the evidence. <u>United States v. Suarez</u>, 588 F.2d 352, 354 (2d Cir. 1972).

In the present case, there are no comments which remotely approach a denial of fundamental fairness. The prosecutor's comments were based on reasonable inferences from the evidence. The prosecutor made fair arguments based on the testimony and sought to raise doubts in the defense testimony.

Furthermore, even if the comments were improper, the error of the prosecutor was at best harmless. <u>See United States v. Hastings</u>, 461 U.S.499 (1983) (harmless error standard of <u>Chapman v. United States</u>, 386 U.S. 18 (1967) applicable to prosecutor's improper summation). Therefore, counsel can not be found to be ineffective for failing to object to the assistant district attorney's summation.

Therefore, I make the following:

-6-

DarrellMcKelvieDAOFiles136

## R E C O M M E N D A T I O N

AND NOW, this 7th day of October , 1985, IT
IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas
corpus be DENIED. There is no probable cause for appeal.


PETER B. SCUDERI
UNITED STATES MAGISTRATE

—7—

DarrellMcKelvieDAOFiles137

**D-2**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRELL N. MCKELVIE        :        CIVIL ACTION
                          :
         v.               :
                          :
MARY LEFTRIDGE-BYRD, et al :        No. 00-CV-3409


BECHTLE, S.J.

                    O R D E R


        AND NOW, this        day of           , 2000, upon
careful and independent consideration of the petition for writ of
habeas corpus, and after review of the Report and Recommendation
of United States Magistrate Judge Arnold C. Rapoport, IT IS
ORDERED that:

        1.  The Report and Recommendation is APPROVED and
ADOPTED.

        2.  The petition for a writ of habeas corpus is DENIED
AND DISMISSED.

        3.  There is no probable cause to issue a certificate
of appealability.

                        BY THE COURT:


                        _____
                        LOUIS C. BECHTLE, S.J.




IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRELL N. MCKELVIE          :          CIVIL ACTION
                             :
        v.                   :
                             :
MARY LEFTRIDGE-BYRD, et al   :          No. 00-CV-3409
                             :
ARNOLD C. RAPOPORT           :
UNITED STATES MAGISTRATE JUDGE

FILED
OCT 27 2000
MICHAEL E. KUNZ, Clerk
Dep. Clerk

REPORT AND RECOMMENDATION

        Before the Court is a pro se petition for a writ of
habeas corpus filed by Darrell N. McKelvie pursuant to 28 U.S.C.
§2254.  The petitioner is currently incarcerated in the State
Correctional Facility at Chester, Pennsylvania.  For the reasons
that follow, it is recommended that this petition be dismissed
and denied without an evidentiary hearing.

PROCEDURAL HISTORY

        The petitioner was convicted by a jury in the Court of
Common Pleas of Philadelphia of first degree murder, conspiracy
and two counts of aggravated assault on January 28, 1975.  He was
sentenced to life imprisonment. [1]  He filed a direct appeal with
the Pennsylvania Supreme Court, which affirmed the conviction.

_____

1.  The facts set forth in this procedural history have been
taken from the Petition for Writ of Habeas Corpus, the District
Attorney's Response to the Petition for Writ of Habeas Corpus,
and the state court records attached thereto.

2

The petitioner sought collateral relief under the Post Conviction Hearing Act (PCHA), 42 Pa. C.S.A. § 9541, _et seq._, which was denied by the PCHA court on December 6, 1979. The Supreme Court affirmed the denial on March 11, 1983.

The petitioner filed his first federal habeas action at 85-2083. In a Report and Recommendation dated October 7, 1985 the Honorable Peter B. Scuderi, U.S.M.J., recommended that the petition be denied on its merits. On October 29, 1985 the Honorable Joseph L. McGlynn, Jr. approved and adopted the Report and Recommendation, and denied habeas relief.

On July 6, 2000 the petitioner filed the instant action seeking federal habeas relief on four grounds.

<u>DISCUSSION</u>

On April 24, 1996 President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 106(b) of the Act amends 28 U.S.C. § 2244(b) and requires that "before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." As amended, 28 U.S.C. §2244(b)(3)(A) requires a district court to dismiss a second or successive petition unless the court of appeals has given approval for its second filing.

The petitioner's 1985 petition was based on the same conviction, and was decided on its merits. Therefore, this petition is a second federal habeas petition, subject to prior

3

approval by the Third Circuit before it can be considered by this Court.

As the petitioner has failed to obtain the required authorization from the Court of Appeals for the Third Circuit, this petition must be dismissed.

FILED

OCT 27 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

<u>RECOMMENDATION</u>

AND NOW, this    27th    day of October, 2000, IT IS
RESPECTFULLY RECOMMENDED, that the Petition for Writ of Habeas
Corpus, pursuant to 28 U.S.C. § 2254, be DISMISSED.  There is no
probable cause to issue a certificate of appealability.

BY THE COURT:

_____

ARNOLD C. RAPOPORT
UNITED STATES MAGISTRATE JUDGE

10/27/00

D. McKelvie

M. Leftridge - Byrd

DA for Phila.

Atty. Gen of Pa

M. Scarengelli

5